UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

CORNELIUS A. BROWN,

                Petitioner,                Case No. 1:08-cv-151

v.                                  Honorable Paul L. Maloney

LLOYD RAPELJE,

                Respondent.
_____/

## REPORT AND RECOMMENDATION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of 50 to 75 years and a consecutive term of 2 years, imposed by the Ingham County Circuit Court on October 10, 2001, after a jury convicted Petitioner of second-degree murder, MICH. COMP. LAWS § 750.317, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. In his *pro se* petition, Petitioner raises five grounds for relief, as follows:

    I.     THE STATE COURT(S) RULED CONTRARY TO ESTABLISHED UNITED STATE'S SUPREME COURT LAW, WHEN RULING THAT PETITIONER WAS NOT ENTITLED TO A NEW TRIAL OR EVIDENTIARY HEARING BASED ON NEWLY DISCOVERED EVIDENCE SHOWING THAT THE PROSECUTION COMMITTED <u>BRADY</u> AND <u>YOUNGBLOOD</u> VIOLATIONS, VIOLATING PETITIONER'S <u>6TH</u> & <u>14TH AMENDMENT</u> RIGHT'S [SIC] TO A <u>FAIR TRIAL</u> AND <u>DUE PROCESS OF LAW</u> BY SUPPRESSING AND/OR WITH[H]OLDING EXCULPATORY EVIDENCE:

        A.     THE PEOPLE COMMITTED A <u>BRADY</u> VIOLATION WHEN IT'S [SIC] BALLISTICS AND FIREARMS EXPERT FAILED TO DISCLOSE MATERIAL, IMPEACHMENT AND EXCULPATORY

INFORMATION REGARDING "UNIQUE LAND AND GROOVE IMPRESSION MEASUREMENTS" ON PIECES OF BULLETS AND FRAGMENTS USED TO IDENTIFY THE ACTUAL OR POSSIBLE MURDER WEAPONS USED IN THIS CRIME.

B.   PETITIONER POSSESS[ES] NEWLY DISCOVERED STATE OF MICHIGAN VEHICLE TITLE INFORMATION REGARDING SUPPRESSED CRIME SCENE EVIDENCE, TO WHICH A LAND ROVER, THAT SHOWS THAT THE STATE OR IT[S] INVESTIGATOR(S) IN VIOLATION OF BRADY & YOUNGBLOOD FAILED TO PRESERVE AND DISPOSED OF THIS VITAL EXCULPATORY EVIDENCE AFTER THE INITIATION OF HIS ADVERSARIAL PROCEEDINGS.

II.   THE STATE COURT ABUSED IT'S [SIC] DISCRETION AND RENDERED AN UNREASONABLE APPLICATION OF TOME V UNITED STATES, WHEN RULING THAT THERE WAS NO PREJUDICE FROM THE ADMISSION OF THE HEARSAY TESTIMONY OF PENNY OUSLEY (AMBER SPEED'S MOTHER) REGARDING AMBER SPEED'S "PRIOR CONSISTENT STATEMENTS" OF PETITIONER'S ALLEGED ADMISSION OF GUILT AND THREAT'S [SIC] REGARDING HIS PARTICIPATION IN THIS CRIME.

III.   THE STATE COURT ABUSED IT'S [SIC] DISCRETION WHEN IT MISAPPLIED THE LAW TO DETERMINE THAT PETITIONER'S 6TH & 14TH AMENDMENT RIGHT'S [SIC] WEREN'T VIOLATED BY APPELLATE COUNSEL'S FAILURE TO COMPLY WITH APPELLATE RULE MCR 7.212(C)(7) CAUSING VITAL ISSUE(S) TO BE CONSIDERED ABANDON[ED].

IV.   THE STATE COURT ABUSED IT'S [SIC] DISCRETION AND RENDERED AN UNREASONABLE DETERMINATION OF THE FACTS PRESENTED, WHEN RULING THAT PETITIONER'S 6TH & 14TH AMENDMENT RIGHT'S [SIC] TO A FAIR TRIAL AND DUE PROCESS OF LAW WASN'T VIOLATED BY PROSECUTORIAL MISCONDUCT WHERE THE STATE AND IT'S [SIC] BALLISTICS EXPERT SGT. POPE USED INTENTIONAL DECEPTION, MISREPRESENTATION OF FACTS AND ASSERTION OF FACTS NOT IN EVIDENCE TO ARGUE THAT SCIENTIFIC EVIDENCE PROVED THAT A HI-POINT MODEL 995 9MM CARBINE KILLED MS. ROGERS.

V.   THE STATE COURT ABUSED IT'S [SIC] DISCRETION AND RULED CONTRARY TO ESTABLISHED UNITED STATE SUPREME COURT

AUTHORITY, WHEN IT RULED THAT THE PROSECUTOR PROVIDED
SUFFICIENT EVIDENCE ON THE CAUSE OF DEATH ELEMENT OF
2ND DEGREE MURDER, AND DID NOT VIOLATE PETITIONER'S
14TH AMENDMENT RIGHT TO DUE PROCESS OF LAW, WHERE IT
FAILED TO PROVE THAT THE WEAPON ALLEGEDLY POSSESSED
BY THE PETITIONER CAUSED THE VICTIM'S DEATH.

(Contents to Mem. in Supp. of Pet., docket #10-2.)  Respondent has filed an answer to the petition

(docket #22) stating that the grounds should be denied because they are procedurally defaulted, are

noncognizable state law claims, or have no merit.  Upon review and applying the AEDPA standards,

I find that all grounds are without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from the December 15, 1999 death of Shemika Rogers,

who was shot in the head, chest, and arms while inside her Range Rover vehicle.  Following a

preliminary examination, Petitioner was bound over on December 12, 2001, on charges of open

murder and felony firearm.  Together with co-defendant Sam Jones, III, Petitioner was tried before

a jury beginning July 9, 2001, and concluding on August 8, 2001.[1]

During the course of the jury selection, counsel for Petitioner raised a *Batson*

challenge that was denied, subsequently renewed, and again denied.  (Tr. I, 164-73; Tr. II, 274-80.)

---

[1]Transcripts of the eighteen days of trial proceedings will be designated as follows:

| | | | | | |
|---|---|---|---|---|---|
| Tr. I | July 9, 2001 | Tr. VII | July 19, 2001 | Tr. XIII | July 31, 2001 |
| Tr. II | July 10, 2001 | Tr. VIII | July 20, 2001 | Tr. XIV | Aug. 2, 2001 |
| Tr. III | July 12, 2001 | Tr. IX | July 23, 2001 | Tr. XV | Aug. 3, 2001 |
| Tr. IV | July 13, 2001 | Tr. X | July 24, 2001 | Tr. XVI | Aug. 6, 2001 |
| Tr. V | July 16, 2001 | Tr. XI | July 27, 2001 | Tr. XVII | Aug. 7, 2001 |
| Tr. VI | July 17, 2001 | Tr. XII | July 30, 2001 | Tr. XVIII | Aug. 8, 2001 |

Defense counsel also moved in limine to limit testimony about drugs or narcotics and to exclude evidence about the defendants' possession of firearms on the night of the murder because two weapons seized from defendants a year later were tested and excluded as the murder weapons. (Tr. II, 280-86.)   The court denied the motion regarding the testimony about the firearms. (Tr. II, 286.) With respect to the drug issue, the court held that the prosecutor would not be permitted to mention the issue during his opening statement. The court instructed both sides that, before introducing evidence of drugs, counsel must approach the bench to present a foundational basis and receive a ruling. (Tr. II, 286-87.)

East Lansing Police Officer Dennis Aven testified that, on December 15, 1999, at approximately 8:15 p.m., he was dispatched to 500 West Lake Lansing Road, Apartment Building C after a call reporting that shots had been fired. (Tr. II, 323-26.) It was raining lightly and the roads were wet. (Tr. II, 326.) Shortly after arriving, Aven received an additional report that there may be a victim of a shooting in a Toyota Land Cruiser located outside Building B. (Tr. II, 327.) Aven approached a Land Rover, which had its lights on and its engine running. (Tr. II, 327-38.) He approached the vehicle from the driver's side and saw an occupant slumped against the headrest of the driver's seat. (Tr. II, 328-29.) He could not get the occupant's attention and the vehicle doors were locked. When he went to the passenger side, he could see the occupant was bleeding and her right hand was moving. (Tr. II, 329.) Aven found the window of the rear passenger door lowered by three to four inches, and he was able to unlock the door and get into the front passenger seat. (Tr. II, 329-30.) Aven noted the woman had a hole in the side of her head and other wounds to her body. (Tr. II, 330.) The woman was unable to communicate with him. Aven stayed with her until the emergency medical team arrived. (Tr. II, 330.) Because vehicles were parked on either side of the

Land Cruiser, Aven and other officers and paramedics placed the car in neutral and rolled it back about ten feet in order to fully open the doors. (Tr. II, 331.) After the woman had been loaded into the ambulance, Aven went back inside the vehicle and retrieved a purse from the front floorboard of the passenger side. (Tr. II, 332.) He noted damage to the passenger front windshield, the front passenger door, and the hood post area. (Tr. II, 332.) He gave the purse to the paramedics to take to the hospital. The purse eventually was given back to him by hospital personnel. (Tr. II, 333.) The purse contained a driver's license for Shemika Rogers. (Tr. II, 333.) Hospital personnel also gave him Rogers' clothing, and the attending physician, Dr. Abood, gave Aven a bullet fragment removed from Rogers' head during surgery. (Tr. II, 334.) Aven placed all of the items into evidence with identifying information. (Tr. II, 336-37.) Aven left the scene with the ambulance, and he turned over the vehicle to Sergeant Mitchell, who was the ranking supervisor on duty. (Tr. II, 340.) Shortly before he left the scene, Aven became aware that there had been a young child in the vehicle at the time of the shooting. (Tr. II, 346.)

East Lansing Police Detective Barbara Letarte testified that, on the night of the shooting, she was a patrol officer with the department and part of the crime scene investigation team. (Tr. II, 359-60.) Letarte was called to the scene at approximately 9:00 p.m. (Tr. II, 360.) When she arrived, crime scene tape surrounded the area of investigation. (Tr. II, 361.) About a half an hour later, she made a videotape of the general vicinity of the crime. (Tr. II, 361.) Letarte identified the videotape, which was admitted into evidence and played for the jury. (Tr. II, 362-64.) Music could be heard on the audio portion of the tape, which Letarte testified came from the vehicle's radio. (Tr. II, 364.) Officer Dave DeKorte took about 20 photographs of the scene, which Letarte subsequently reviewed. (Tr. II, 364-65.) Letarte identified Exhibits 1 through 16, 19 and 20 as 18 of the 20

photographs, and she identified Exhibit 21 as the supplemental photograph log. (Tr. II, 367.) Those exhibits were admitted into evidence. (Tr. II, 368.) Letarte testified that, once shell casings were located, they were photographed, measured, and collected by Letarte and Officer Dave DeKorte. (Tr. III, 390.) Letarte identified Exhibits 23 to 28 as six 9 millimeter Luger shell casings and Exhibit 29 as one 9 millimeter PMP shell casing, all recovered at the scene and all placed in sealed envelopes. (Tr. III, 391-93, 396.) Exhibit 30 was identified as a sketch Letarte made of the scene, with notations for where each of Exhibits 23 to 29 were recovered. (Tr. III, 393-95.) Exhibits 23 to 30 were admitted. (Tr. III, 395.) An eighth shell casing was recovered at the scene but was not introduced during Letarte's testimony. (Tr. III, 400.) Exhibits 23 through 25 all were located 19 to 20 feet south and 7 to 8 feet west of the diagram reference point, within an eight-inch circle of one another. (Tr. III, 401-03.) Exhibit 26 was located approximately 15 feet five inches south and 19 inches west of the reference point, approximately 4 feet from Exhibits 23 through 25. (Tr. III, 404.) Exhibit 27 was about 2 feet south of Exhibit 26, and Exhibit 28 was two feet south of Exhibit 27. (Tr. III, 404-05.) All seven casings were within a 12-foot span. (Tr. III, 405.) Letarte identified footprints in Exhibit 14, located under a tree. Letarte considered making footcasts but did not attempt it because of the heavy rain that had fallen that evening. (Tr. III, 406.) Exhibit 59, 60, 61 and 62 were identified and admitted as aerial photographs of the Homestead apartment complex. (Tr. III, 412-13.)

East Lansing Police Officer David DeKorte testified that he was called on December 15, 1999 to assist Officer Letarte with the investigation of the crime scene. (Tr. III, 477.) DeKorte testified that he attended the autopsy of Shemika Rogers conducted on December 22, 1999. (Tr. III, 478.) He observed the removal of bullets and fragments from the victim, and he secured and identified the items and ultimately transported them to the Michigan State Police crime lab for

analysis. (Tr. III, 478-84.)  He identified Exhibit 32 as a bullet removed from Rogers' head. (Tr. III, 478-79.) Exhibit 33 was identified as a bullet that had entered on the victim's right side and lodged on her left side near the left breast. (Tr. III, 482.) Exhibits 34 and 35 also were identified. Exhibit 35 was identified as the bullet and jacket from the left elbow area. (Tr. III, 483.) Exhibits 32 through 34 were admitted into evidence. (Tr. III, 486.)

Outside the presence of the jury, the court heard oral argument concerning the use as demonstrative evidence of a Hi Point model 995 carbine rifle that shoots a nine millimeter Luger cartridge as being similar to the one witnesses saw being used the night of the shooting. (Tr. III, 491-98.) The court allowed use of the rifle as demonstrative evidence. (Tr. III, 498-502.)

Michigan State Police Detective Sergeant Reinhard Pope testified as an expert in the field collection of evidence, firearms and ballistics identification. (Tr. III, 503-08.) On December 16, 1999, Pope responded to a request that the Department of State Police assist the East Lansing Police Department in the investigation of the December 15, 1999 shooting.  Pope was asked to process a vehicle with gunshot damage that had been towed to the impound lot of the East Lansing Police Department.  The vehicle had been stored in an unheated building overnight, and it was wet. Pope suggested that the vehicle be placed in a heated area overnight so that it would be dry and susceptible to processing for latent fingerprints. (Tr. III, 508-09.)  He returned on December 17 to examine the vehicle at the new location.  Detective Sergeant Andrew Wing, a latent fingerprint examiner, accompanied Pope. (Tr. III, 509.)  Pope took photographs of the exterior of the vehicle and then Wing processed the vehicle for fingerprints. (Tr. III, 510.)  Pope identified Exhibits 36 through 57 as photographs he took, and the exhibits were admitted. (Tr. III, 511.)  On Exhibits 36 to 47, Pope identified eight separate bullet entry holes in the right front part of the vehicle, including

four bullet holes in the windshield, two bullet holes in the metal at the bottom of the windshield, one bullet hole through the roof post and a final hole through the right rearview mirror and the passenger window. (Tr. III, 512-19.) Each hole was tagged with a particular letter designation, from A through H. (Tr. III, 513, 519.) Pope also identified Exhibits 48 through 50 as photographs taken from inside the vehicle, which showed bullet holes both before and after some parts of the dashboard had been dismantled. (Tr. III, 519-20.) Exhibits 51 to 52 showed the driver's seat with a quantity of blood and several bullet holes. (Tr. III, 521.) Exhibit 53 showed the seat after it had been cut open to locate three fragmented bullets that were lodged inside. (Tr. III, 521-22.) A portion of a fired bullet jacket was found in the passenger side floorboard. (Tr. III, 522.) Exhibits L-1 through L-8 were identified as various fragments recovered from the following respective places in the vehicle: the right roof pillar; the rear seatbelt receptacle well; passenger floorboard; the drivers seat; passenger side floor; the coat on the passenger seat; and two from the inside driver's seat rear. (Tr. III, 522-32.) Pope also testified that he had examined bullet fragments identified as Exhibits 31 through 34, and cartridge cases identified as Exhibits 23 through 29. (Tr. III, 533-36.) Pope also testified that the cartridge cases found at the scene were 9 millimeter Luger cartridge cases. Such cases could be loaded with 9 millimeter, .38 caliber or .357 caliber bullets, because the diameters of those three bullets are essentially the same. (Tr. III, 538-39.) According to Pope, it is extremely difficult to tell from looking at a cartridge case which particular firearm fired a cartridge, if you don't have the weapon. (Tr. III, 540.) Any weapon has the potential to leave identifying marks from the magazine lips, the chamber, the extractor, the ejector, the firing pin or the breach face. (Tr. III, 540-42.) Typically, when a shooting has occurred but police have not yet identified the weapon, the crime lab examines all weapons that come in against evidence submitted from the shooting. (Tr. III, 543.)

Pope testified that all eight cartridge cases were examined to determine whether they had a common history, and five cartridge cases appeared to have been fired from the same weapon. (Tr. III, 544, 549-50.) The other three were insufficiently marked to determine whether they had been produced by the same or another source. (Tr. III, 551.)

The bullet fragments were examined for impressions made by the rifling in the barrel. Rifling produces certain class characteristics, such as a left or right twist and the number of grooves of a certain width, depending on the firearm model. (Tr. III, 552-54.) In addition, a particular firearm may leave individual characteristics that would be unique to the firearm, from which it is possible to determine whether they were fired from a common firearm, even if the examiner did not know what particular firearm it was. (Tr. III, 554.) On five bullet fragments, Pope could identify common class rifling characteristics of eight lands and grooves of a certain width and with a right twist. (Tr. III, 556.) Those class characteristics would be consistent with two particular firearms: a Hi Point model 995 nine millimeter carbine and a Charter Arms undercover model .38 Special caliber revolver. (Tr. III, 557.) The revolver carries a five-shot capacity. (Tr. IV, 575.) A revolver does not extract and eject spent cartridge cases; they are stored in the cylinder until emptied by the user. (Tr. IV, 578.) Assuming as accurate the location of each of the eight cartridge cases and that the bullet fragments came from the spent cartridge cases located at the scene, the model 995 Hi Point carbine was the likely weapon used. (Tr. IV, 579-80.) If a revolver had been used, one would expect find five cartridges together, having been emptied from the firearm before reloading, together with three additional casings having been discharged and then emptied from the chamber. (Tr. IV, 580.) The carbine, in contrast, would have ejected the cartridge cases in a line consistent with where the cases were found in this case. (Tr. IV, 581.) Moreover, the cartridge cases found at the scene were

nine millimeter Luger cartridge cases. Such cases could not have been fired from a .38 Special caliber revolver, because the nine millimeter cartridge is too short and the nine millimeter Luger case does not have the necessary rim that would keep the cartridge from sliding in the .38 Special caliber revolver. (Tr. IV, 581.) A nine millimeter Luger such as the 995 carbine typically would eject a cartridge about eight to ten feet. (Tr. IV, 629.)

        Pope also testified that he placed a dowel through a hole that went through both the passenger mirror and the passenger side window, providing two points of contact that prevented the dowel angle from moving. The bullet entered the vehicle at an angle. (Tr. IV, 584-85.) In addition, he could place a dowel through both sides of the roof pillar and get a stable angle. (Tr. IV, 585.) He then could determine the direction from which those two shots came by continuing the line outward. Pope testified that the angles of the shots were divergent. (Tr. IV, 590-91.) Pope testified that the divergent angles could have been caused either by the vehicle having been in motion or the shooter moving between shots. (Tr. IV, 592.) Pope testified that the location of the cartridge cases would be consistent with someone moving and shooting. (Tr. IV, 593.) Pope determined that eight bullets struck the vehicle. (Tr. IV, 612.) Pope did not visit the scene as the vehicle already had been moved by the time he was called in. (Tr. IV, 618-19.) He could not testify how far away from the vehicle the shooter was located. (Tr. IV, 623.)

        Pope next testified about gunshot residue evidence. He opined that, if the firearm was discharged from a distance of only one foot from the vehicle, as Petitioner argued, both vaporous lead and gun powder particles likely would have been recovered from the vehicle. (Tr. IV, 595.) In performing his visual examination, he found no gun powder particles. (Tr. IV, 596.) He did not conduct a chemical test, as he had no indication that a question existed about possible gunshots from

- 10 -

a foot away.  (Tr. IV, 596, 608-09.)  He acknowledged that rain could wash away gun powder particles, though rain would be less likely to wash away vaporous lead that had been deposited.  (Tr. IV, 596.)

Pope tested numerous firearms submitted by various agencies to compare with the ballistic evidence from the cartridge cases and bullets recovered at the scene.  None matched.  (Tr. IV, 597.)  Pope produced a report of his findings in the ordinary course of business, and the report was introduced as Exhibit 58.  (Tr. IV, 598.)

Beth Leary testified that, on December 15, 1992, she lived in Homestead Apartments Unit B-48.  (Tr. IV, 663.)  Leary, her roommate Amy Hughes, and a friend were at home when the apartment buzzer sounded.  She heard a child's voice.  (Tr. IV, 664.)  Leary went downstairs to see what was happening, and she found a boy outside the locked building entrance.  (Tr. IV, 665.)  The boy, who was about kindergarten age, was upset and crying and was not wearing a coat.  (Tr. IV, 665.)  Leary invited the boy in, and he told Leary that his mother was dead.  She asked if the boy had been hurt, and he responded that his mother was shot, that "[t]he bad guys came up to the car and were saying where's Kevin, where's Kevin, and then they shot."  (Tr. IV, 671.)  Once inside her apartment, Leary dialed 911 and gave the phone to her friend Paul.  (Tr. IV, 667-69.)  At some point during the 911 call, the boy got on the phone.  (Tr. IV, 670.)  While he was in the apartment, the boy identified himself as Darius, and he repeated his story more than once.  At some point, Leary's friend Paul, who had gone downstairs, returned with a man named Kevin.  Darius repeated the story to Kevin.  (Tr. IV, 671-73.)  Kevin left the apartment with Amy Hughes to make a telephone call from a neighbor's apartment.  (Tr. IV, 676-77.)  Darius remained in Leary's apartment until the police

- 11 -

took him outside some 15 minutes later.  (Tr. IV, 670.)  East Lansing police officers returned to her apartment within the hour to take statements from Leary, Hughes and Paul.  (Tr. IV, 677, 679.)

Jonas Rogers testified that Shemika Rogers was his daughter.  (Tr. IV, 686.)  From 1995 to December 1999, Shemika lived in the Lansing area and attended Lansing Community College.  (Tr. IV, 691.)  Shemika introduced her father to Kevin Kennard in early 1998.  (Tr. IV, 695.)  Shemika lived with her son Darius Puryear at the 500 West Lake Lansing Road complex for one to two months before her death.  (Tr. IV, 698.)  The Range Rover Shemika was driving was leased to Jonas Rogers.  (Tr. IV, 699, 703.)  Jonas Rogers did not see the vehicle again after the shooting, as it remained in the possession of the police.  (Tr. IV, 703.)

East Lansing Police Sergeant William Mitchell was the afternoon shift supervisor on the date of the shooting, and, in that role, he took command of the investigation.  (Tr. IV, 705.)  He arrived at the scene approximately five or six minutes after the initial dispatch call.  (Tr. IV, 706.)  The dispatch call indicated that someone was seen running carrying a shotgun.  (Tr. V, 774.)  When Mitchell arrived, other officers were beginning to make the crime scene inaccessible to traffic.  (Tr. IV, 709.)  He was present when the vehicle was moved.  (Tr. IV, 709-11.)  He instructed that two crime scene investigators be called, and he remained at the scene for several hours.  (Tr. IV, 711.)  Mitchell made the decision not to move the vehicle back to its original position after the ambulance crew had transported Shemika Rogers.  He based that decision on the fact that the vehicle had only been moved six to twelve feet backwards, and that movement was necessary to give the medical crew access.  Once moved, there was no way to be sure the vehicle was paced in its exact original position.  (Tr. IV, 712-13; Tr. V, 767-68.)  Officers taped off the crime scene and prevented entry.  (Tr. IV, 714.)  Mitchell called Captain Muhn to advise him of the incident, and Muhn wanted the

- 12 -

Michigan State Police crime lab notified.  The state police were called within 45 minutes of Mitchell's arrival. (Tr. IV, 716.) Mitchell spoke to the lieutenant from the state police headquarters, and they jointly decided the state police would process the vehicle but would not come to the scene. Mitchell had the vehicle towed to the East Lansing police impound lot.  (Tr. IV, 717, Tr. V, 796-97.)

Mitchell testified that 911 calls to the service used by the East Lansing Police Department were tape recorded.  (Tr. IV, 718.)  The tape of the 911 call was 40 minutes long, and it included all communications that occurred at the dispatch center while the call was ongoing.  The edited version that contains only the relevant 911 communication was only five minutes.  (Tr. IV, 719-20.)  The short tape was admitted.  (Tr. V, 803.)

Kristen Borton testified that she resided at the Homestead Apartments in December 1999.  (Tr. V, 825.)  On December 15, shortly after the dinner hour, Borton was getting her son out of the passenger seat of her husband's truck. (Tr. V, 831-32.)  The family was returning from dinner at a restaurant, and Borton and her husband were driving two vehicles. (Tr. V, 832.)  Borton arrived in her Volvo before her husband arrived, and she parked in a slot near her apartment door.  (Tr. V, 834.)  Her husband, Jason Savage, parked his Chevy truck a couple of spaces away from her.  (Tr. V, 835.)  Borton went to the truck and, as she was unbuckling her son's seatbelt, she heard five or six popping sounds that she believed were gunshots. (Tr. V, 836.)  When she heard the shots, Borton covered her son with her arms, facing towards the back of the truck.  She heard a loud engine noise and saw two vehicles go by, driving fast.  (Tr. V, 838.)  She identified the second vehicle as a silver Taurus.  (Tr. V, 840.)  Borton recalled that a silver car was behind her as she drove into the parking lot, though it went into the complex in a different direction.  She also recalled seeing a silver Taurus parked, facing out, in the covered parking area near her building.  (Tr. V, 841, 846-48.)  In addition,

- 13 -

Borton saw a group of five or six people standing across from the Taurus and behind a line of vehicles.  (Tr. V, 849-51.)  After seeing the cars leave the lot, Borton turned her head toward the front of the truck and saw someone running by with a long gun.  (Tr. V, 853-54.)  The running man was thin and wore a bulky coat, dark pants and white tennis shoes.  (Tr. V, 856.)  Borton grabbed her son, and she and her husband ran into their apartment.  Borton called 911 and reported that she had heard gunshots.  (Tr. V, 830, 858-59.)  The five-minute version of the 911 tape was then played for the jury.  (Tr. V, 860.)

Jason Savage testified that he heard gunshots when he was parking his vehicle on December 15, 1999.  (Tr. V. 894.)  He pulled into the lot just behind Kristen Borton.  (Tr. V, 896.)  Savage testified that he saw a group of individuals, whom he did not recognize as residents,  hanging out in the parking lot.  (Tr. V, 897.)  He also saw a silver car parked in the carport across from Building Two, which caught his eye because it was parked at an angle.  (Tr. V, 897-99, 901.)  He thought the car was a newer Taurus.  (Tr. V, 902.)  As he was getting out of his truck, his wife came to the passenger door to get their son.  (Tr. V, 903-04.)  Savage heard four popping sounds that he believed were gunshots.  (Tr. V, 904.)  He got down on the floorboard of his truck.  (Tr. V, 905.)  Less than a minute later, he saw a man run down the sidewalk in front of the vehicle.  (Tr. V, 905.)  The man had a weapon in his right hand and was wearing white tennis shoes, a darker color pair of pants, a black stocking cap and a checkered coat or dark down jacket.  The man's head was shaved and he had a stocky or athletic build.  (Tr. V, 906-07, 920-21, 935.)  He then heard the squealing of tires and saw two vehicles pass, one of which was a silver Taurus.  (Tr. V, 907-08.)

Sergeant Andrew Wing of the Michigan State Police testified that he was assigned as a latent print examiner to the East Lansing laboratory in December 1999.  (Tr. VI, 955.)  Wing

- 14 -

was assigned to process the vehicle in which Shemika Rogers was killed.  (Tr. VI, 957.)  Wing located three usable latent prints.  (Tr. VI, 957, 961.)  He successfully matched one of those prints with a known comparison provided by the East Lansing Police Department.  The matched print was taken from the outside front passenger door near the door handle.  (Tr. VI, 961.)  The known comparison print was one of approximately twelve comparison fingerprint sets provided by the East Lansing Police.  (Tr. VI, 962.)  The print belonged to Eric Thompson.  (Tr. VI, 962.)

Kevin Kennard testified under a grant of immunity from prosecution.  (Tr. VI, 1042.) According to Kennard, he, Shemika Rogers and Rogers' four-year-old son, Darius Puryear, lived together in an apartment at the Homestead Apartments in December 1999.  (Tr. VI, 969, 972.)  On the evening of her death, Kennard and Shemika Rogers were together in a vehicle.  (Tr. VI, 975.) Kennard testified that he had known Sam Jones for about six months at the time of the murder.  (Tr. VI, 975-96.)  He also knew Mike Jones and had met Petitioner, who went by the name "Big Al." (Tr. VI, 976.)  Kennard identified both Sam Jones and Petitioner in the courtroom.  (Tr. VI, 975, 977.)  Kennard testified that Mike Jones owed him $1,600.00 for two ounces of cocaine supplied to Jones in late July or early August 1999.  (Tr. VI, 979.)  Kennard had tried to collect the debt approximately 30 times before October 1, 1999, but then stopped trying to collect in early October. (Tr. VI, 980-81.)  At that time, Kennard approached Sam Jones and Patrick Gentry in a bar, where they were standing with others.  He told Sam Jones that his brother owed him some money.  (Tr. VI, 981-82.)  Sam Jones responded that he had told his brother that failing to pay was going to get him killed.  He also told Kennard that he was going to get with his brother and call Kennard back.  (Tr. VI, 982.)  Sam Jones told Kennard that, if Kennard had a problem with Sam's brother, he had a problem with Sam Jones.  (Tr. VI, 984.)  Approximately a week later, sometime between 10:00 p.m.

and midnight, Kennard went to a location on Luwanna Street because he expected Patrick Gentry and Sam Jones to be there. (Tr. VI, 983-85.) Kennard carried a .38 caliber revolver. (Tr. VI, 985.) Kennard knocked, and Patrick Gentry answered the door. (Tr. VI, 990.) Sam Jones, Darrian Mendenhall and Patrick's girlfriend also were at the residence. (Tr. VI, 990-91.) Kennard and Gentry began arguing. Gentry pulled out a gun and Kennard then pulled out his own gun. (Tr. VI, 991.) Gentry fired two or three shots and Kennard ran out of the house without firing his weapon. (Tr. VI, 991-92.) While Gentry and Kennard were arguing, Sam Jones ran out of the house. (Tr. VI, 992.) Later that evening, while Kennard was in his car, Sam Jones, Patrick Gentry and Darrian Mendenhall called Kennard on his cell phone. (Tr. VI, 993.) Sam Jones told Kennard that he was going to kill Kennard when he saw him. (Tr. VI, 994.) He talked to Sam Jones one other time before the murder of Shemika Rogers, in November 1999. Kennard called Sam Jones and asked if they were ready to pay Kennard his money, suggesting that they meet at Red Lobster to make the payment. (Tr. VI, 995.) Sam Jones said, "[H]ell no. . . . [Y]ou caught me slippery before, but you'll never catch me again when I see you." (Tr. VI, 996.) The meeting did not take place. Subsequently, Patrick Gentry called Kennard's apartment telephone number, which was billed in the name of Kevon Flennoy. (Tr. VI, 998.)

On December 15, 1999, driving the Range Rover, Kennard dropped Shemika Rogers off at work at 4:30 p.m. and kept Darius with him. He picked Shemika up again at 7:15 or 7:30 p.m. (Tr. VI, 999-1000.) They drove to Arby's and ate in the car. They then headed towards their apartment. (Tr. VI, 1001-02.) They came into the complex from Lake Lansing Road, and Kennard parked facing the complex. (Tr. VI, 1007.) Kennard got out and left the engine running while he went inside to use the restroom. (Tr. VI, 1007.) He then planned to drive Shemika over to her

girlfriend Naomi's house.  (Tr. VI, 1008.)  When he last saw Shemika, she was seated in the

passenger seat and Darius was strapped in the back seat on the driver's side.  (Tr. VI, 1008.)

Kennard thought he heard something break in his kitchen and went to explore.  He then went to the

bathroom.  After a total of three or four minutes in the apartment, he heard Darius calling his name,

and he assumed that he was going to tell Kennard to hurry up.  (Tr. VI, 1009.)  Kennard continued

until he was finished.  After about two more minutes, he picked up the trash bag and walked outside.

(Tr. VI, 1009-10.)  As he walked toward the vehicle, he did not see anyone in the car.  When he got

closer, he saw the bullet holes and Shemika.  He dropped the bags and ran back into the complex,

fearing that someone was still outside.  (Tr. VI, 1010-11.)  He was trying to get his key in the door

when a woman opened her door and asked, "Is this your son?"  (Tr. VI, 1011.)  He found Darius and

spoke with him and also spoke with the 911 operators on his neighbor's phone.  (Tr. VI, 1012.)

Kennard testified that Darius told him that "the bad guys came up to the truck and shot my mommy."

(Tr. VI, 1036-37.)  Darius also told Kennard that the men first asked, "[W]here's Kevin at?"  (Tr.

VI, 1037.)  Darius said that his mother replied by shaking her head.  (Tr. VI, 1037.)  Kennard left

the neighbor's apartment to go to another apartment, where he called his cousin and two of his

friends.  (Tr. VI, 1012.)  He later accompanied the police to the East Lansing police station, where

he made a statement.  Kennard also made a call from the police car and some others from the station.

(Tr. VI, 1013-14.)  Kennard called Sam Jones from the police station on someone's cell phone and

told Jones that he would kill him for shooting Kennard's girlfriend.  (Tr. VI, 1014-15.)  Sam Jones

started laughing at Kennard and said, "I don't know what you're talking about."  (Tr. VI, 1016.)

   Kennard admitted that he lied in his statement to the police when he told them the

shooting was not drug related.  (Tr. VI, 1016.)  On the night of the shooting, Kennard was not

carrying a weapon and had not communicated with Sam Jones, Mike Jones, Patrick Gentry, Darrian Mendenhall or Cornelius Brown.  (Tr. VI, 1017.)

Darius Puryear testified that, at the time his mother was shot, he was sitting in the middle of the back seat of the vehicle.  (Tr. VII, 1111.)  His mother was sitting in the driver's seat.  (Tr. VII, 1118.)  Darius saw three people near the truck, one at the rear and two forward of the driver's side front door.  (Tr. VII, 1111-12.)  Darius saw a man holding a gun in two hands standing in the middle, a couple of feet forward of the truck.  (Tr. VII, 1114.)  For cross-examination, the parties agreed to admit the videotaped statement made by Darius to the police and to allow only one attorney to cross-examine.  (Tr. VII, 1107-08.)  Darius stated that he was four years old at the time of the shooting.  (Tr. VII, 1118.)  He testified that the men who came up to the vehicle asked where Kevin was and Darius' mother said something to the men.  (Tr. VII, 1121.)  The videotape was played for the jury but was not transcribed.  (Tr. VII, 1123-24, 1128.)

Benjamin Wells testified that he had known Kevin Kennard for years.  On December 15, 1999, Wells was in the drive-thru lane at the Arby's at Cedar St. and Miller in Lansing when he saw a truck pull into the lane behind him.  He believed the vehicle belonged to Kevin Kennard.  (Tr. VII, 1129-30.)  Remembering the confrontation between Kennard and Patrick Gentry and that Gentry had expressed fear of Kennard, Wells called Gentry to tell him that Kennard was behind him.  (Tr. VII, 1132, 1146.)  After he left the Arby's, Wells saw Kennard's vehicle near the highway entrance on South Cedar, appearing to head towards East Lansing.  (Tr. VII, 1134.)  Wells reported what he saw to Gentry.  (Tr. VII, 1135.)  Wells did not see Kennard, and he thought the driver was a woman.  (Tr. VII, 1140.)

- 18 -

Patrick Gentry agreed to testify under immunity from prosecution for any drug or weapons offenses that may have taken place near the time he resided on Luwanna Street or for obstruction of justice for formerly untruthful statements made in the investigation of the Rogers shooting.  (Tr. VII, 1151, 1156, 1358.)  Gentry was not given immunity from involvement in the actual shooting of Shemika Rogers or in any then-pending case in which he was charged.  (Tr. VII, 1153-54, 1358, 1360.)  He was given immunity, however, from any charge of conspiracy to murder or aiding and abetting the murder.  (Tr. VIII, 1360.)  Darrian Mendenhall and Amber Speed were given comparable immunity.  (Tr. VII, 1166; Tr. VIII, 1201-02.)  All three agreed that they would not invoke their Fifth Amendment rights not to incriminate themselves in their testimony about the death of Shemika Rogers.  (Tr. VII, 1202-03.)

Gentry testified that he lived on Luwanna Street with Amber Speed, Darrian Mendenhall and Sam Jones from March to October 1999.  (Tr. VIII, 1217-18.)  Jones was Gentry's best friend at the time.  (Tr. VIII, 1241.)  He also testified that he knew Petitioner, Cornelius Brown, who was also known as "Big Al."  (Tr. VIII, 1219-20.)  According to Gentry, on October 15, 1999 at 8:30 or 9:00 p.m., Gentry, Speed, Mendenhall and Jones were at the apartment, together with Speed and Gentry's daughter and Jones' female guest.  (Tr. VIII, 1223-24.)  Kennard arrived at the home and knocked on the door.  Gentry let him in and Kennard partially closed the door behind him. Three other individuals accompanied Kennard and pushed their way inside, telling everyone to lay down on the floor.  (Tr. VIII, 1227.)  Two of the three were wearing masks.  (Tr. VIII, 1234.) Kennard and two friends carried guns and demanded the $2,000.00 owed to him by Mike Jones.  (Tr. VIII, 1227.)  As Kennard came in the door, Sam Jones ran out of the door, followed shortly by his female friend.  (Tr. VIII, 1229-30.)  The men were in the house for about ten minutes.  (Tr. VIII,

1232.)  Gentry saw Kennard dragging Speed around the bedroom by the hair.  (Tr. VIII, 1233.)  One

of the masked men, Purcell Christopher Banks, took off his mask when he recognized Gentry.  (Tr.

VIII, 1235-36.)  Kennard and his companions took Gentry's cell phone and a bag of marijuana when

they left the house.  (Tr. VIII, 1238.)  After the men left, Sam Jones returned, having called the

police.  (Tr. VIII, 1239-40.)  Jones was very shaken up by the incident.  (Tr. VIII, 1241.)  Jones

called Petitioner that night, and Gentry spoke with Petitioner in person the following day.  (Tr. VIII,

1242-43.)

On December 15, 1999, Gentry no longer lived in the Lansing area, having moved

to Ovid with his girlfriend, Amber Speed, Mendenhall, and a friend of Speed's.  At about 12:30 or

1:00 p.m., he, Mendenhall and Speed left Ovid and drove to Lansing.  He and Mendenhall dropped

Speed off at work and spent the afternoon together, eventually going to the home of Lavar Burton

and Ben Wells.  (Tr. VIII, 1246-48.)  They picked Speed up at approximately 6:30 or 7:00 p.m.  (Tr.

VIII, 1248.)  Both Gentry and Mendenhall had cell phones at the time, and Gentry's Nextel phone

also had two-way radio service.  Gentry had programmed Sam Jones' name into the two-way feature,

permitting them to have direct communication.  (Tr. VIII, 1250.)  He had not programmed in the

names of either Mendenhall or Wells.  (Tr. VIII, 1251.)  At 8:00 p.m., as Gentry, Speed and

Mendenhall were on Pennsylvania Avenue, having just left Gentry's mother's house, Gentry

received a call from Ben Wells.  (Tr. VIII, 1251-52.)  Gentry was driving a gold 1992 Mercury Sable,

Speed was in the front passenger seat, and Mendenhall was in the back seat behind Gentry.  (Tr. VIII,

1254.)  Wells told Gentry that Kennard was not in Detroit, as Gentry had believed, and that Wells

had seen Kennard and Shemika Rogers in a tan or yellow Range Rover at the Arby's on South Cedar.

Wells reported that Kennard was heading toward East Lansing.  (Tr. VIII, 1256-57, 1260.)  Gentry

- 20 -

turned the car around and headed back to the south side of the city.  (Tr. VIII, 1255-56.)  Having

completed the call from Wells, Gentry gave his phone to Mendenhall, who made a telephone call.

(Tr. VIII, 1273.)  Gentry began to look for the vehicle described by Wells.  (Tr. VIII, 1266.)  He

spotted the vehicle on the highway as he approached the highway ramp.  (Tr. VIII, 1269.)  He

pointed the vehicle out to Mendenhall.  (Tr. VIII, 1269.)  Gentry followed the Range Rover.

Mendenhall was on the same telephone call when they spotted the vehicle.  (Tr. VIII, 1273.)  The

total time that elapsed between  receiving Well's call and the spotting of the vehicle was five to eight

minutes.  (Tr. VIII, 1282.)  Mendenhall described over the cell phone the route they were taking.

(Tr. VIII, 1291.)  Mendenhall described turning into the Homestead Apartments.  (Tr. VIII, 1293.)

According to Gentry, they drove into the apartment area and backed their car into a designated

parking spot nine or ten cars away from the Range Rover.  (Tr. VIII, 1303.)  Sam Jones parked his

own vehicle, a silver or grey Ford Taurus, somewhere on the other side of the Range Rover.  (Tr.

VIII, 1304.)  Gentry and Mendenhall got out of their car and walked down the sidewalk until they

saw the Range Rover and Sam Jones' vehicle.  (Tr. VIII, 1305.)  Gentry and Mendenhall walked up

to the passenger side of the Range Rover, Gentry near the back door and Mendenhall near the front

door.  Mendenhall knocked on the window and asked where Kevin was.  (Tr. VIII, 1309-10.)

Shemika responded that he was not in the truck with her.  (Tr. VIII, 1310.)  At that point, Sam Jones

got out of his car, and Gentry called out to him that Kennard was not in the truck.  (Tr. VIII, 1310.)

Suddenly, Gentry heard shots being fired from in front of the vehicle.  (Tr. VIII, 1312.)  He began

running to the right, towards the silver Taurus.  (Tr. VIII, 1313.)  Amber pulled up about five car

lengths from the Taurus, and Gentry and Mendenhall jumped in the car.  (Tr. VIII, 1314.)  As Gentry

jumped into the car, he saw Petitioner running down the sidewalk.  (Tr. VIII, 1315.)  Amber drove

- 21 -

away, past the Taurus.  (Tr. VIII, 1315.)  They got back on the highway and headed for Ovid.  (Tr. VIII, 1317.)  About five minutes later, they stopped at a gas station in Ovid, and Sam Jones and Petitioner arrived at the gas station shortly thereafter.  (Tr. VIII, 1318.)  Gentry, Speed and Mendenhall drove to their house, and Sam Jones and Petitioner joined them.  (Tr. VIII, 1320.)  Everyone arrived at 9:30 or 10:00 p.m., and Jones and Petitioner stayed for two or three hours.  (Tr. VIII, 1320-21.)  Gentry testified that Petitioner made statements about the events while he was at the house.  (Tr. VIII, 1321.)  According to Gentry, as they watched the television news report about the shooting, Petitioner said, "Fuck, my aim off.  I should have made sure I killed that bitch."  (Tr. VIII, 1322.)  Petitioner also stated that he should have gone to target practice and that he was not going to leave any loose ends about the incident.  (Tr. VIII, 1322.)  While the news report was on, Jones received two cell phone calls.  Gentry heard Jones say, "I don't know what you're talking about.  I didn't kill your girl."  (Tr. VIII, 1347.)  Jones stated that he was talking to Kevin Kennard, and he seemed shocked that Kennard was calling from the police department.  (Tr. VIII, 1348.)  After the news report, Petitioner called someone and told them that he needed them to take care of some business for him.  (Tr. VIII, 1356.)  After the news report, Petitioner threatened Gentry by saying "that he did this bull shit for [Gentry], and that he wasn't going to leave no loose ends open about his self.  Whoever was scared, keep their mouths closed because he wasn't going down for this shit."  (Tr. VIII, 1323.)  Petitioner also carried a long, black rifle.  (Tr. VIII, 1323.)  The gun was placed on Gentry's kitchen counter during the time Petitioner was at Gentry's house.  Petitioner wanted to leave the weapon with Gentry because Gentry lived in the country and had a lot of land, but Gentry refused.  (Tr. VIII, 1326.)  During the time the weapon was on the counter, Gentry had a good opportunity to look at it.  He described it as long, black, with a clip and a shoulder strap.  The

weapon also had a laser sighting device.  (Tr. VIII, 1326-27.)  Petitioner took the weapon with him when he left Gentry's home.  Gentry saw no weapon in Sam Jones' possession.  (Tr. VIII, 1343.)  Petitioner and Jones left Gentry's home at midnight or 1:00 a.m.  When they left, they drove Amber Speed's car because Petitioner did not want to drive the Taurus to Lansing after what had happened.  (Tr. VIII, 1345, 1356.)  Gentry and Mendenhall drove the silver Taurus back to Petitioner's house the next day.  (Tr. VIII, 1345-46.)

More than a week later, Petitioner drove a van containing Gentry, Mendenhall and Jones to the East Lansing Police Department, so that they could speak with detectives.  On the way, Petitioner told everyone to have their stories straight.  Petitioner was angry and told the others that he wasn't leaving any loose ends and he wasn't going to jail for the shooting.  The story each was supposed to tell was that he had no knowledge of the shooting.  (Tr. VIII, 1350-52.)  Gentry lied in his statement to the police.  (Tr. VIII, 1349.)  Almost a year after the shooting, Gentry told a different, allegedly truthful story to the police.  (Tr. VIII, 1353.)  According to Gentry, he told the truth to his attorney about three or four months after the shooting.  He also told his friend, Michael Thomas, and his mother and sister.  (Tr. VIII, 1353-54.)  Gentry told his mother the story about a week-and-a-half after the shooting.  (Tr. VIII, 1354.)  Gentry testified that he did not know a shooting was going to take place that night.  He kept quiet because of Petitioner's threats and his fears for his own and Amber Speed's safety.  (Tr. VIII, 1354-55.)  Until Gentry was arrested, Petitioner called Gentry every other day to remind him to keep his mouth closed.  (Tr. VIII, 1357-58.)

Amber Speed testified that she lived with Patrick Gentry at the Luwanna Street address between May 1999 and October 1999.  Sam Jones stayed at the residence part of that time,

and Darrien Mendenhall stayed overnight sometimes.  (Tr. IX, 1586-87.)  In October 1999, Kevin

Kennard came to their house and tried to rob them.  Kennard grabbed Speed by the ponytail and

dragged her around the bedroom.  (Tr. IX, 1588.)  Kennard and two men accompanying him had

guns.  (Tr. IX, 1588-89.)  Speed heard gunshots fired during the incident.  (Tr. IX, 1590.)  The day

after the robbery, she and Gentry moved to the Red Roof Inn for a week-and-a-half before moving

to Ovid.  Mendenhall also moved into the Ovid residence, as did a friend of Speed's, Heather.  Speed

testified that she first met Petitioner when they lived on Luwanna Street.  In December 1999, Speed

worked in Holt, Michigan, and she had two vehicles available to her, a 1989 rust-colored Mercury

Sable and a 1995 Chevy Impala.  (Tr. IX, 1593.)

On December 15, 1999, Speed left Ovid with Gentry and Mendenhall at

approximately 12:15 p.m., in order to get to work by 1:00 p.m.  They drove the Mercury Sable.  (Tr.

X, 1601.)  Speed's daughter was living with Speed's mother at that time.  (Tr. X, 1601.)  Gentry was

supposed to pick Speed up at 9:00 p.m.  (Tr. X, 1602.)  Because she was not feeling well, Speed

called Gentry to pick her up at about 6:30 p.m.  (Tr. X, 1603.)  After Gentry and Mendenhall picked

Speed up, they went to Gentry's mother's house for about ten minutes and then to a friend's house

before heading back to Ovid.  (Tr. X, 1604.)  When they were on their way back to Ovid, Gentry

received a cell phone call.  (Tr. X, 1607.)  After receiving the call, Gentry turned the car around and

headed back south to Lansing.  (Tr. X, 1610.)  They drove toward the Arby's at South Cedar and

Miller Road.  (Tr. X, 1611.)  As the result of the phone call, they were looking for a particular

vehicle, which they intended to follow.  (Tr. X, 1612.)  Patrick drove the vehicle fast, and Speed told

him to slow down.  (Tr. X, 1617.)  As they turned left off South Cedar to get onto I-96, Gentry

spotted the vehicle, which was a gray Range Rover.  (Tr. X, 1613.)  During this time, Mendenhall

- 24 -

was on the cell phone and Speed could hear his side of the conversation, describing where they were as they traveled.  (Tr. X, 1615-16.)   By the time they turned into the apartment complex off Lake Lansing Road, Speed wanted to leave.  (Tr. X, 1618.)  Speed testified that Gentry followed the route into the parking lot and backed into a parking place by the second building from the last turn.  (Tr. X, 1622.)   During the time they were in the parking lot, Speed could not see the Range Rover because of obstructions, but she saw Sam Jones next to a silver Ford Taurus on the other side of an island.  (Tr. X, 1625-26.)  Gentry and Mendenhall got out of the car and walked on the sidewalk toward the area of the Range Rover.  (Tr. X, 1629.)  Gentry left the car running, and Speed moved over into the driver's seat because she was scared.  (Tr. X, 1629.)  Speed heard Mendenhall's and Gentry's raised voices.  (Tr. X, 1630.)  She heard Gentry say, "Kevin's not in here."  (Tr. X, 1631.) She became more apprehensive and moved the car out into the lot until it was just past the Range Rover.  (Tr. X, 1631.)  She saw Petitioner holding a gun with a red beam pointing from it.  (Tr. X, 1634.)  She then saw the gun flash and heard a loud shot.  (Tr. X, 1635.)  When she saw the gun flash, Gentry was near the back of the Range Rover, and Mendenhall was just in front of him.  (Tr. X, 1636.)  Speed turned away as soon as she saw the flash, and then Gentry and Mendenhall jumped into the car.  (Tr. X, 1635.)  When they were in the car, she immediately drove away, traveling somewhat in excess of the speed limit.  (Tr. X, 1638, 1640.)  Before she drove away, she saw Petitioner running down the sidewalk.  (Tr. X, 1638-39.)  Speed got onto Route 127 and headed toward Ovid.  (Tr. X, 1641.)  They stopped at a gas station, where they soon were joined by the silver Taurus in which Sam Jones and Petitioner were traveling.   (Tr. X, 1642.)  Speed then drove home and the silver Taurus followed.   The silver Taurus parked in the garage.  (Tr. X, 1644.)   Speed, Gentry, Mendenhall, Jones and Petitioner all came into the house.  (Tr. X, 1644.)  According to

- 25 -

Speed, Petitioner had a long gun with a strap and a red-beam sight, which he placed on the kitchen counter for about 20 minutes.  (Tr. X, 1646,1648-49, 1663-65.)  Speed made a drawing of the weapon she saw, which was admitted as Exhibit 79.  (Tr. X, 1655, 1662.)

Speed testified that all five watched the news about the events at the Homestead Apartments. (Tr. X, 1666.) Petitioner made comments during the broadcast. He first stated, "I hope that bitch is dead.  If she ain't, I need to go to target practice because my aim is off."  (Tr. X, 1667.) He also stated, "I know you all ain't acting like no pussys because I did this shit for you guys.  Kevin didn't give a fuck about going to your house with your baby and your girl there. . . . I don't  give a fuck, I ain't leaving no loose ends. . . . [A]nd nobody ain't going to tell on me, because if they do, they ain't going to come to court to testify."  (Tr. X, 1668.)   After the news broadcast, Gentry and Petitioner argued about hiding the gun at Gentry and Speed's house.  (Tr. X, 1669-70.)  Petitioner wanted to hide the gun at their house because it was out in the country with lots of room to bury it. (Tr. X, 1670.) They did not keep the gun at the house.  (Tr. X, 1670.) Jones received two cell phone calls, and she heard Jones' side of the conversation in one of those.  Jones stated, "[M]an, I don't know what you're talking about.  What are you talking about?  Your girl?  I didn't kill your girl." (Tr. X, 1671-72.) Jones indicated that the caller was Kevin Kennard.  (Tr. X, 1673.)  Speed also recalled Petitioner making two cell phone calls after the television news report.  Petitioner told a woman to "go upstairs, don't answer the door."  (Tr. X, 1673-74.)  Then shortly before they left Speed's house, Petitioner called someone and said that he was coming to town and needed them to do him a favor.  (Tr. X, 1674.)  Sam Jones and Petitioner left Speed's house at about midnight, driving Speed's Mercury Sable.  (Tr. X, 1676.)  The next morning, Gentry drove Speed in the silver Taurus to a gas station in Webberville, where her mother met her.  Gentry and Mendenhall then

continued on.  Speed did not know what was done with the silver Taurus after that.  (Tr. X, 1677.)
Speed was cross-examined about the condition of her eyes.  She admitted to having had muscle
surgery, but she denied having problems with her eyes.  (Tr. X, 1750.)

Darrian Mendenhall testified that he periodically stayed at the Luwanna Street address
with Gentry and Speed, though he did not live there. Sam Jones lived at the address part-time.  (Tr.
XI, 1864-65.)  Mendenhall was at the address when Kevin Kennard and three others came to the
house in October 1999.  (Tr. XI, 1866-67.)  When Gentry opened the door to Kennard, everything
appeared normal until Kennard pulled out his gun.  Jones jumped up to grab Kennard and three other
men entered, at which point Jones ran out.  (Tr. XI, 1947.)  A second person ran out shortly
thereafter.  (Tr. XI, 1949.)  One of the men put a gun to Mendenhall's head and told him to lie down
on the floor.  (Tr. XI, 1947.)  He heard Kennard yelling from the back room to get the money .  (Tr.
XI, 1948.)  Shots were fired after that, and Kennard and the man in the living room ran out.  (Tr. XI,
1949.)

On December 15, 1999, Mendenhall witnessed the shooting of Shemika Rogers.  (Tr.
XI, 1868.)  On that day at 9:30 a.m., Gentry and Mendenhall came into Lansing from Ovid to bring
Speed to work.  (Tr. XI, 1868-69.)  Gentry drove the 1989 Mercury Sable.  (Tr. XI, 1869.)  After
visiting with Lavar Burton and Ben Wells during the day, they picked up Speed at about 7:30 p.m.
They drove to Gentry's mother's house, and Gentry went into the house for a few minutes.  (Tr. XI,
1871.)  Just as they were leaving Gentry's mother's house, Gentry received a cell phone call telling
him that Kennard was at the Arby's on Cedar Street.  (Tr. XI, 1872-73.)  Gentry then drove towards
the Arby's.  (Tr. XI, 1873.)  Gentry received another call to say that Kennard's Range Rover had
gotten on the highway.  (Tr. XI, 1877.)  They did not reach the Arby's, but spotted the brownish

Range Rover on the expressway.  (Tr. XI, 1878.)  Gentry then gave his phone to Mendenhall.  (Tr.

XI, 1873.)  Gentry got on the expressway at the Jolly Road entrance near Dunckel, following the

Range Rover.  (Tr. XI, 1878-79.)  Mendenhall called Sam Jones to tell him that they had found

Kennard and were following the Range Rover.  (Tr. XI, 1874-75, 1878-79.)  Mendenhall described

where they were.  Jones stated that he was on his way.  (Tr. XI, 1879.)  Mendenhall called Jones

again to tell him that they were getting off the expressway at Lake Lansing Road, and he then

described their route into the apartment complex.  (Tr. XI, 1880-81.)  Jones stated that he was right

behind them.  (Tr. XI, 1883.)  Gentry backed his vehicle into a parking place 30 to 50 feet from

where the Range Rover was parked, and Gentry and Mendenhall got out of the car.  (Tr. XI, 1883,

1893-94.)  They walked toward the Range Rover with the intention of confronting Kennard.  (Tr.

XI, 1894-95.)  Mendenhall and Gentry were unarmed and Mendenhall had no idea that Sam Jones

was with Petitioner or that anyone was armed.  (Tr. XI, 1895-96.)  As he walked toward the Range

Rover, Mendenhall saw Jones' silver Taurus backing into a carport on the other side of the road from

the Range Rover.  (Tr. XI, 1897-98.)  The silver Taurus subsequently moved to a parking place near

the sidewalk on the other side of the road, where it was positioned at the time of the shooting.  (Tr.

XI, 1898-99, 1902.)  When he reached the Range Rover, Mendenhall turned and knocked on the

front passenger window.  (Tr. XI, 1898, 1904.)  Gentry was standing just behind Mendenhall on the

passenger side.  (Tr. XI, 1904.)  Mendenhall called out to the woman seated in the Range Rover's

front passenger seat, so as to be heard through the closed window.  (Tr. XI, 1904-05.)  When he was

asking about Kevin, Mendenhall saw the little boy in the back seat.  (Tr. XI, 1906.)  Mendenhall

never saw Sam Jones outside his vehicle.  (Tr. XI, 1907.)  Gentry called out that Kennard was not

in the truck, apparently addressing Sam Jones in the Taurus.  (Tr. XI, 1907-09.)  At this time, the

Mercury also had been moved to the rear of the Range Rover.  (Tr. XI, 1909.)  A couple of seconds after Gentry called out, shots were fired.  (Tr. XI, 1910-11.)  Mendenhall heard a total of four to five shots.  (Tr. XI, 1912.)  As soon as he heard shots, Mendenhall grabbed Gentry saying, "[L]et's go, somebody is shooting."  (Tr. XI, 1911.)  Mendenhall and Gentry jumped into the back of the Mercury.  As he was getting in the car, Mendenhall saw Petitioner walking quickly down the sidewalk, carrying a gun.  (Tr. XI, 1912-13.)  A strap held the gun over Petitioner's shoulder, and Petitioner held the firearm in his hands.  (Tr. XI, 1913-14.)  Mendenhall did not see Petitioner get into the silver Taurus.  (Tr. XI, 1914.)  Speed drove the Mercury away quickly but not at excessive speed.  (Tr. XI, 1917-18.)  As the Mercury drove toward Ovid, Gentry climbed into the front passenger seat.  (Tr. XI, 1919.)  They stopped at a gas station near Ovid.  (Tr. XI, 1919.)  Mendenhall went into the station to pay for the gas, and when he came out, he saw Gentry talking to Sam Jones and Petitioner, who had driven up in the Taurus.  (Tr. XI, 1920.)   Both cars then drove to the Ovid home of Gentry, Speed and Mendenhall.  (Tr. XI, 1921.)  The silver Taurus parked by the side of the garage.  Jones and Petitioner stayed for about two and one-half hours.  (Tr. XI, 1921-22.)

Petitioner brought his gun into the house and placed it on the kitchen counter.  (Tr. CI, 1922.)  The gun was discussed repeatedly during the night, as Petitioner wanted to have the Ovid house residents get rid of the gun or bury it on the property. (Tr. XI, 1923.)  Both Gentry and Mendenhall refused.  (Tr. XI, 1924.)  Petitioner stated that he would get rid of the gun himself, but that no one should say anything because he was not going to leave any loose ends.  (Tr. XI, 1924.)  The television news came on, reporting the shooting at the Homestead Apartments.  (Tr. XI, 1924-25.)  Watching the broadcast, Petitioner stated that his aim was bad and he needed to take target practice. (Tr. XI, 1925.) Both Sam Jones and Petitioner received calls on their cell phones.  (Tr. XI,

- 29 -

1929.)  Jones received a call from Kennard at about the same time as the television coverage came

on.  During the call, Jones repeatedly told Kennard that he did not know what Kennard was talking

about and that he hadn't done anything.  (Tr. XI, 1929-30.)  Petitioner received a call from a woman

named Heather at approximately the same time.  He told the caller, "[D]on't call me, don't use the

phone . . . ."  (Tr. XI, 1930-32.)  He then hung up.  (Tr. XI, 1931.)

        Mendenhall testified that he had been surprised by shots being fired on December 15,

1999.  His intent had been to discuss the matter with Kennard, and he anticipated that, if things got

out of hand, it would just be fighting.  He did not take any weapons and was unaware that anyone

had weapons.  (Tr. XI, 1926.)  Mendenhall learned from reading the paper four or five days after the

shooting that Shemika Rogers had died.  (Tr. XI, 1934.)  Shortly after Rogers' death, Mendenhall

and Gentry were in a van with Jones and Petitioner.  Petitioner told the others that they had better

have their stories straight because he was not going down for something he had nothing to do with,

since he had done the shooting on their behalf.  (Tr. XI, 1935.)  A day or two after the shooting,

Mendenhall, Jones, Petitioner, Gentry, Toliver Bragg (also known as "Big Mike") and Heather were

at Big Mike's house.  The shooting was discussed, and Petitioner told Heather that "if she say

anything or if anything get out, the same thing will happen to her like it did to the girl on t.v."  (Tr.

XI, 1938-41.)  Mendenhall testified that he did not report what he knew about the shooting and lied

to the police because Petitioner had threatened him and he was afraid of Petitioner.  (Tr. XI, 1935-

36.)

        Forensic pathologist Lawrence Simpson testified that, on December 22, 1999, he

performed the autopsy on Shemika Rogers, who died on December 21, 1999.  (Tr. XII, 1959.)

Rogers had a gunshot wound to the right forehead that exited by the left ear.  (Tr. XII, 1961-62.)  She

also had a deformed bullet in the outside portion of the left breast, a bullet in the soft tissue region of the elbow, and a piece of the bullet jacket in the right forearm.  (Tr. XII, 1962-63.)  The wound to the head caused major damage and was not survivable.  (Tr. XII, 1965, 1969, 1972.)  The other wounds were not life threatening.  (Tr. XII, 1965.)

Heather Frazier testified under an order immunizing her from prosecution for drug or weapons offenses and for aiding or abetting or being an accessory after the fact to the murder or for obstruction of justice.  (Tr. XIII, 2297.)  Frazier testified that, in December 1999, she had known Petitioner and Sam Jones for about seven months.  (Tr. XIII, 2227, 2231.)   During this period, she met Patrick Gentry and Darrian Mendenhall while at Petitioner's house on Cooper Street.  (Tr. XIII, 2232-33.)  Three days after the December 15, 1999 shooting, Heather saw Gentry and Mendenhall again at Big Mike's house.  (Tr. XIII, 2234-35.)   Big Mike's house was located two streets away from Petitioner's house.  (Tr. XIII, 2235.)  In December 1999, Frazier was sexually involved with Petitioner and periodically stayed overnight at his home.  (Tr. XIII, 2236-37.)  Petitioner also had a one-year-old child, CJ, who lived with him part of the time.  (Tr. XIII, 2237.)  Frazier had a substance abuse problem during that period.  (Tr. XIII, 2239.)  On December 15, 1999, Frazier's roommate dropped Frazier off at Petitioner's house at 6:30 or 7:00 p.m.  (Tr. XIII, 2238.)  When she arrived at the house, Petitioner, Sam Jones and Big Mike were at the house, as was CJ.  (Tr. XIII, 2240-41.)  Frazier started wrapping Petitioner's Christmas gifts for his son.  (Tr. XIII, 2241.)  Petitioner also asked her to wrap the presents for Big Mike's children.  (Tr. XIII, 2241.)  She worked in the living room and the others were conversing in the dining room and living room areas.  (Tr. XIII, 2247.)  On the dining room table, Petitioner had a receiver for police radio traffic.  (Tr. XIII, 2247.)  About 45 minutes after she arrived, Sam Jones received a two-way radio communication on

a Nextel cell phone.  (Tr. XIII, 2248, 2261.)  Frazier was seated about ten feet from Jones when he

received the call.  (Tr. XIII, 2248.)  She heard the caller tell Jones that "the bitch as[s] nigga is at

Arby's."  (Tr. XIII, 2252.) After Jones received the call, he grabbed a short, silver handgun and put

it in his pants.  (Tr. XIII, 2249, 2253-54.)  Jones said, "[L]et's go."  Jones, Petitioner and Big Mike

began to leave.  (Tr. XIII, 2254.)  Petitioner carried a long gun with him.  (Tr. XIII, 2255.)  Although

Frazier could not be certain it was the same weapon, Petitioner previously had pointed a long gun

at her.  (Tr. XIII, 2255.)  The gun she had seen in Petitioner's possession had a device that caused

a red light to appear on the target.  (Tr. XIII, 2259-60.)  The three men left the house in a silver

Taurus that Jones and Petitioner both regularly drove.  (Tr. XIII, 2260-62.)  As they left, Big Mike

said, "I'm too old."  (Tr. XIII, 2261.)  Frazier remained at Petitioner's house with CJ.  Half an hour

to 45 minutes later, she heard a transmission over the police scanner about a shooting in East

Lansing.  (Tr. XIII, 2268.)  Frazier took CJ upstairs.  About fifteen minutes later, she heard a knock

at the door.  (Tr. XIII, 2269.)  She stood on the stairs holding CJ for five to seven minutes.  She

eventually heard a female voice calling her name.  (Tr. XIII, 2270.)  She opened the door to a short,

thin, light-skinned woman she did not know.  (Tr. XIII, 2271.)  The woman identified herself as

Camille and mentioned Petitioner in making a request.  In response to the request, Frazier gathered

up CJ's things and she and CJ left the house with the woman.  (Tr. XIII, 2273.)  They got into the

woman's Grand Am, which held two other young children.  They went first to a gas station where

Frazier routinely made her phone calls.  The woman then took Frazier back to Frazier's home.  (Tr.

XIII, 2274-75.)  Frazier arrived at her home at about 9:00 or 9:30 p.m.  (Tr. XIII, 2275.)  Once there,

she started drinking.  After a couple of hours, Frazier went out to some public place with someone

she could not remember.  She eventually was taken back to the gas station to call Petitioner.  (Tr.

- 32 -

XIII, 2277-78.) Petitioner told her, "[I]f you're coming over, come over now." (Tr. XIII, 2278.) She was driven to Petitioner's house, and she arrived at 1:30 or 2:00 a.m. (Tr. XIII, 2278.) Petitioner let her in, and she began to get into an argument with him. In an uncharacteristic fashion, rather than argue back, Petitioner made no response. She asked him what was wrong. He told her that she wouldn't understand and that he would take her home if she wouldn't shut up. (Tr. XIII, 2279.) She got quiet and ultimately stayed the night. (Tr. XIII, 2280.) When they went to bed, Petitioner placed a small, silver handgun on the bed, next to his head. The handgun appeared to be the same one she had seen Sam Jones possess earlier. (Tr. XIII, 2280-81.) She awoke the next day at about 11:30 a.m. Petitioner was not there, but he returned shortly thereafter. (Tr. XIII, 2281-82.) Three days later, she was with Petitioner at Big Mike's house with Big Mike, Sam Jones, Darrian Mendenhall and Patrick Gentry. (Tr. XIII, 2283.) Petitioner told the others that his story for December 15, 1999 was that he was at home, wrapping Christmas presents. Sam Jones stated that he was with his girlfriend. (Tr. XIII, 2284.)

   Three or four days before the shooting, a friend of Frazier's came to her house and introduced her to Kevin Kennard. (Tr. XIII, 2286.) Kennard asked Frazier if she knew where Petitioner lived. (Tr. XIII, 2287.) She did not tell Kennard Petitioner's address. That night, Frazier called Petitioner to tell him that some guy from Detroit had come over and was asking questions about Petitioner and Sam. (Tr. XIII, 2288-90.) The next day, she saw Petitioner at his house, and she told him that the man, Kevin, had asked where Petitioner lived. (Tr. XIII, 2288-90, 2292.) Petitioner was angry, but then said he didn't care and "it wasn't his beef." (Tr. XIII, 2293.)

   East Lansing Police Detective Richard Torres testified that he had located a Hi Point model 995 carbine at a gun shop, and the rifle was admitted as demonstrative evidence of one of the

two models of weapons that the ballistic expert had identified as the only possible sources of the bullets that killed Rogers.  (Tr. XIV, 2386, 2389-90.)  Torres also demonstrated the laser sight on the rifle, which, when activated, would shine a red laser light on the target.  (Tr. XIV, 2392.)  Torres testified that he had separately shown the demonstrative rifle to Gentry, Speed and Frazier.  (Tr. XIV, 2394, 2396, 2397.)

Amber Speed's mother, Agnes Ousley, testified that she received a telephone call from her daughter at approximately 2:00 a.m. on December 16, 1999.  Amber was hysterical and crying.  (Tr. XIV, 2412.)  Amber asked her mother to pick her up at 8:00 the next morning at the Mobil gas station at the intersection of M-52 and I-96.  (Tr. XIV, 2413.)  Patrick drove Amber to the gas station, and Ousley could see another person in the car, but she could not identify who it was. (Tr. XIV, 2413.)  Once Amber was in the van, she told her mother that she had seen someone shot in East Lansing at an apartment complex.  She said that she saw Al do it.  Ousley did not know Al at that time.  (Tr. XIV, 2414-15.)  Ousley advised her daughter to report what she knew to the police. Amber said she was afraid to go to the police because they told had told her that if anyone talked, they weren't going to leave any loose ends.  (Tr. XIV, 2415.)  Ousley denied that Amber had problems with her vision.  At birth, Amber had amblyopia, which involved the muscles of the eyes, not the vision.  (Tr. XIV, 2424-25.)

East Lansing Police Officer Mark Potter identified Exhibit 81 as the gun seized on December 21, 2000, from Petitioner's Cooper Street address.  (Tr. XIV, 2429-31.)  The weapon had no laser sight.  (Tr. XIV, 2433.)  The parties stipulated that two weapons were seized from Petitioner's address, Exhibit 81 and a handgun that was not introduced.  The parties also stipulated

that expert examiners had determined that neither weapon fired the bullets that struck Shemika Rogers.  (Tr. XIV, 2442.)

Joshua Powers testified as an employee of A&A Rent-a-Ride.  A silver Taurus was rented to Gary Dabney and Camille Dabney on November 23, 1999.  They transferred to another vehicle after eleven days and then went back to the silver Taurus.  (Tr. XIV, 2444.)  The silver Taurus was returned to the leasing company at 6:00 p.m. on December 22, 1999.  (Tr. XIV, 2445.)

The prosecution rested.  (Tr. XIV, 2446.)  Both defendants, Petitioner and Sam Jones, also rested without introducing any evidence.  (Tr. XIV, 2447.)

At the conclusion of trial, on August 8, 2001, the jury found Petitioner guilty of second-degree murder and felony-firearm.  (Tr. XVIII, 2707.)  On October 10, 2001, Petitioner was sentenced to serve a term of 50 to 75 years for the second-degree murder conviction and two consecutive years for the felony-firearm offense.  (Sentencing Transcript, (S. Tr.), 14-15, docket #51.)

Petitioner, through appellate counsel, filed a motion for new trial on April 2, 2002.  (Cir. Ct. Docket Sheet, 8, docket #29.)  A hearing was held on June 28, 2002.  (Mot. for New Trial Tr. (N.T. Tr.), docket #52.)  At the hearing, Petitioner argued in the alternative that the prosecution had either permitted knowingly false testimony at the preliminary hearing that Kevin Kennard was collecting a gambling debt, or the prosecutor improperly withheld evidence of the immunity agreements under which various witnesses testified that the debt in issue was a drug debt.  The court denied the motion for new trial, finding that the allegedly perjured testimony was only marginally material and that the record indicated that the prosecutor had no knowledge of the false testimony.  The court also concluded that the prosecutor's failure to amend discovery regarding the last-minute

immunity agreements was not intentional and was cured by the allowing the defense both extra time to prepare for cross-examination and the right to recall any witnesses made necessary by the late notice. (N.T. Tr., 19-22.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on August 30, 2002, raised six issues:

I.    THE GOVERNMENT ENGAGED IN REPEATED ACTS OF MISCONDUCT THROUGHOUT THE INVESTIGATION AND PROSECUTION OF THE CASE. THE CONDUCT OF THE POLICE AND PROSECUTION CREATED OVERWHELMING PREJUDICE TO THE DEFENDANT. THE CONVICTION SHOULD BE OVERTURNED AND THE MATTER REMANDED FOR RETRIAL.

II.   THE TRIAL COURT DEPRIVED MR. BROWN OF HIS DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY ALLOWING THE PROSECUTION TO INTERJECT THE ISSUE OF DRUGS INTO THE TRIAL.

III.  THE TRIAL COURT DEPRIVED MR. BROWN OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY ALLOWING THE PROSECUTOR TO INTRODUCE DEMONSTRATIVE EVIDENCE AND BY ALLOWING THE PROSECUTOR TO ELICIT TAINTED TESTIMONY ABOUT A WEAPON. MR. BROWN IS ENTITLED TO A REVERSAL OF HIS CONVICTION.

IV.   THE TRIAL COURT WRONGLY INSTRUCTED THE JURY THAT THE PROSECUTOR MUST ONLY PROVE THAT THE VICTIM DIES FROM BEING SHOT, RATHER THAN THAT THE PROSECUTOR MUST PROVE THAT MR. BROWN SHOT THE VICTIM. THIS ERRONEOUS INSTRUCTION ON THE CAUSATION ELEMENT OF SECOND DEGREE MURDER DIRECTED A VERDICT ON THAT ELEMENT AND/OR SHIFTED THE BURDEN OF PROOF. THIS INSTRUCTION DENIED MR. BROWN A FAIR TRIAL AND REQUIRES A REVERSAL OF THE CONVICTION.

V.    MR. BROWN'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED

> WHERE HE WAS PREJUDICED BY HIS LAWYER'S FAILURE TO PERFORM AT AN OBJECTIVE STANDARD OF REASONABLE COMPETENCE. MR. BROWN IS ENTITLED TO A NEW TRIAL OR TO REMAND FOR A <u>GINTHER</u> HEARING.

> VI.     THE GUILTY VERDICT IS AGAINST THE GREAT WEIGHT OF THE EVIDENCE AND THE DEFENDANT IS ENTITLED TO A REVERSAL OF HIS CONVICTION.

(Def.-Appellant's Br. on Appeal, docket #53.)   Petitioner also filed a *pro per* supplemental brief

raising one issue:

> I.     THE PROSECUTOR PROVIDED INSUFFICIENT EVIDENCE ON THE CAUSE OF DEATH ELEMENT OF DEFENDANT 2nd DEGREE MURDER CONVICTION. WHICH VIOLATED DEFENDANT'S DUE PROCESS TO HAVE EACH ELEMENT OF A CHARGED CRIME PROVEN BEYOND A REASONABLE DOUBT.   DEFENDANT'S CONVICTION SHOULD BE REVERSED BECAUSE THE PROSECUTOR FAILED TO PROVE THAT DEFENDANT OR THE WEAPON POSSESSED BY THE DEFENDANT CAUSED MS. SHEMIKA ROGERS DEATH.

(Def.-Appellant's Supp. Br. on Appeal, docket #53.) Petitioner filed a motion to remand, which was

denied by the Michigan Court of Appeals on January 10, 2003.  (*See* 1/10/03 Mich. Ct. App. Ord.

(MCOA Ord.), docket #53.)  By unpublished opinion issued on October 14, 2003, the Michigan

Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and

sentences.  (*See* 10/14/03 Mich. Ct. App. Opinion (MCOA Op.), docket #53.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme

Court.  Petitioner raised the same seven claims raised before and rejected by the Michigan Court of

Appeals.  By order entered February 27, 2004, the Michigan Supreme Court denied his application

for leave to appeal because it was not persuaded that the questions presented should be reviewed.

(*See* Mich. Ord., docket #54.)

### C.    Post-conviction relief

Petitioner filed a motion for relief from judgment in the Ingham County Circuit Court on January 28, 2005.  In his motion, Petitioner raised six claims: (1) violation of his Fourteenth Amendment rights to a fair trial and due process by the suppression of vital exculpatory evidence and by the denial of an evidentiary hearing on that evidence during trial; (2) abuse of discretion in allowing certain hearsay statements to be admitted into evidence at trial; (3) violation of Sixth and Fourteenth Amendment rights to the effective assistance of appellate counsel; (4) violation of the right to a fair trial and due process through prosecutorial misconduct; (5) reversible error in instructing the jury on the doctrine of transferred intent; and (6) cumulative error.  The circuit court denied the motion in an opinion and order issued September 23, 2005.  (9/23/05 Cir. Ct. Ord., docket #55.)

Petitioner sought leave to appeal to the Michigan Court of Appeals, raising the first five issues raised in the circuit court.  The court of appeals denied leave to appeal on May 18, 2007 on the grounds that Petitioner had failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (5/18/07 MCOA Ord., docket #55.)  Petitioner then sought leave to appeal in the Michigan Supreme Court, raising the same five claims.  Invoking MICH. CT. R. 6.508(D), the supreme court denied leave to appeal on May 18, 2007.  (11/29/07 MSC Ord., docket #56.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has

"drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing

- 39 -

*Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.[2]

---

[2]Respondent contends that grounds one, two and four of Petitioner's application for habeas corpus relief are procedurally defaulted because they were raised for the first time in his motion for relief from judgment and the Michigan Supreme Court relied upon MICH. CT. R. 6.508(D) in denying his application for leave to appeal. Federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). Where, as here, the procedural default issue raises more questions than the case on the merits, it is more reasonable to address the case on the merits without first deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

**Discussion**

I.     Suppression of Exculpatory Evidence

In his first ground for habeas relief, Petitioner complains that the prosecution violated his right to due process and a fair trial when it suppressed or withheld exculpatory evidence, ostensibly in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Arizona v. Youngblood*, 488 U.S. 51 (1988). Petitioner raises two sub-issues. First, he argues that the prosecution violated *Brady* when it failed to disclose evidence that conflicted with the testimony given by the prosecution's ballistics expert. Second, he argues that the prosecution violated *Brady* and *Youngblood* when it failed to preserve the Land Rover in which the victim was killed.

A.     **Ballistics evidence**

Petitioner raises in his petition and appears to have raised in the state courts several distinct arguments concerning the ballistics evidence. First, he asserts that the prosecutor withheld evidence that the precise land and groove marks on five of the bullets or fragments could have come from multiple firearms, not just the two identified by the expert. Second, he asserts that Reinhard Pope's letter indicates that Pope was lying at trial when he said he could not identify a particular weapon. Third, Petitioner contends that the ballistic expert's report squarely indicated that the bullets and fragments came from at least two weapons, one of which had to be the .38 Special revolver.

In *Brady*, 373 U.S. 83, and *United States v. Bagley,* 473 U.S. 667, 675 (1985), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Court has held that

"[t]here are three components of a true *Brady* violation:  [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995).  Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 281 (quoting *Bagley*, 473 U.S. at 682); *see also Cone v. Bell*, 129 S. Ct. 1769, 1783 (2009).  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

Petitioner first asserts that the government suppressed a report by ballistics expert Reinhard Pope, in which Pope allegedly listed thirty-two 9 millimeter weapons and forty-eight .38 Special caliber revolvers as having eight lands and grooves with a right twist.  Petitioner contends that the evidence contradicts Pope's trial testimony that only two weapons had those class characteristics.  In support of his argument, Petitioner attaches a letter received by Petitioner from Detective Sergeant Pope dated October 2, 2002, to which Pope attaches a copy of the pertinent pages from the FBI's General Rifling Characteristics (GRC) book listing weapons with eight lands and grooves with a right twist.  (Pet. Ex. L, docket #1-29.)  As Pope carefully explained to Petitioner in the attached letter, however, Pope's testimony at trial was fully consistent with the list.  While numerous weapons had eight lands and grooves with a right twist, the width of those land and groove measurements was consistent with only two weapons.

A review of Petitioner's purported evidence of suppressed information indicates that it was neither suppressed nor contradictory.  The alleged report is nothing more than the FBI listing

- 42 -

of weapon class characteristics that Pope used to evaluate the evidence in Petitioner's case and to generate his report.  That information was certainly available to Petitioner at the time of trial. Indeed, Pope specifically testified that he used the FBI's general rifling characteristics file in reaching his conclusions.  (Tr. III, 557.)  As the circuit court held in rejecting Petitioner's claim, the evidence was not suppressed in any way.  (9/23/05 Cir. Ct. Ord., 4, docket #55.)  It is well settled that *Brady* does not require production of materials readily available to the defense.  *See Spirko v. Mitchell*, 368 F.3d 603, 610-11 (6th Cir. 2004).

In addition, the allegedly suppressed evidence is in no way favorable to Petitioner. In his testimony, Pope expressly stated that he not only relied on the existence of the class characteristics of eight lands and grooves with a right twist, but he also relied on the width of the rifling marks, another class characteristic.  (Tr. III, 552, 556; Tr. IV, 573.)  Using all of the common class characteristics, Pope was able to narrow the number of weapons that could have produced the rifling marks found on the bullets to two: the 995 Hi Point 995 carbine and the Charter Arms Undercover Model .38 Special caliber revolver.  (Tr. III, 557.)  Pope carefully explained those facts in his letter to Petitioner, and the contents of the letter are consistent with Pope's testimony at trial. As a result, nothing contained in the FBI list was favorable to Petitioner because it was neither exculpatory nor impeaching of Pope's testimony.  *See Strickler*, 527 U.S. at 281-82.  The state court's determination on this issue was an entirely reasonable application of established Supreme Court precedent.

Petitioner next argues that Pope's October 2, 2002 letter and the FBI GRC pages contradict Pope's in-court testimony because the letter stated that no firearm was identified as the source of the bullets and bullet fragments examined by Pope.  (*See* Pet. Ex. L, 2.)  Petitioner argues

that Pope's testimony identified two models of firearms.  Petitioner's argument is meritless.  As Pope

explained in his letter, he could not associate any particular weapon with the bullet fragments he

examined.  (Pet. Ex. L, 1-2.)  By saying that, he was saying only that the individual firearms he

examined could neither be ruled out as the source nor established to be the source.  That explanation

is fully consistent with his trial testimony.  (Tr. IV, 597; Pet Ex. L, 1-2.)  Pope's letter also noted

that, consistent with his trial testimony, five of the bullet fragments contained class characteristics

associated with rifling on only two possible models of weapons.  (Tr. III, 556-57; Pet. Ex. L, 1.)  In

addition, Pope's letter reiterated his trial testimony that five of the cartridge cases appeared to have

been fired from the same weapon and the other three were insufficiently marked for Pope to

determine whether they had been produced by the same or other sources.  (Tr. III, 544, 549-51; Pet.

Ex. L, 1-2.)  As a result, notwithstanding Petitioner's strident assertions, he fails to demonstrate any

inconsistency between Pope's letter and his trial testimony, much less any discrepancy that was

favorable to Petitioner.

Petitioner makes a final argument concerning the handwritten numbers at the top of

the FBI's GRC file list provided by Pope.  (*See* Pet. Ex. L, 3.)  According to Petitioner, the numbers

were written by Pope, disclosing for the first time the precise land and groove measurements taken

from the bullet fragments.  Petitioner asserts that one of the two measurements could only match the

Charter Arms Undercover revolver.  He argues that the numbers demonstrate that multiple shooters

were involved, including one who used a revolver.

Assuming both that the numbers were written by Pope and that the numbers indicate what Petitioner argues,[3] Petitioner fails to demonstrate a *Brady* violation.  As the state circuit court noted, complete information about Pope's findings and opinion was available to Petitioner at the time of trial, to be explored through cross-examination of Pope.  *See United States v. Delgado*, 350 F.3d 520, 527 (6th Cir. 2003) (no *Brady* violation when a defendant knew or should have known the essential facts permitting him to take advantage of the information).  In fact, defense counsel engaged in extensive cross-examination of Pope on a variety of matters, and counsel could easily have inquired about the alleged disparity.  Equally, Petitioner could have sought ballistics examination by his own expert.  There is no indication that either the prosecutor or Pope suppressed anything.

Moreover, Pope squarely testified that no particular firearm could be identified and that either the model 995 Hi Point carbine or the .38 Special caliber revolver could have been the source of any of the bullet fragments containing eight lands and grooves.  (Tr. III, 557.)  Further, Pope made clear that some bullet fragments did not contain eight lands and grooves and therefore could not be associated with any model firearm.  Pope at no time testified that all of the bullet fragments were fired from the same weapon or that one of the sources of the bullets was definitely the model 995 Hi Point carbine.  As a result, to the extent that the numbers provide any new information, that information is not inconsistent with Pope's testimony.  The state court's

---

[3] These assumptions are made for purposes of argument only.  Petitioner fails to present any facts in support of his assertion that Pope wrote the numbers at the top of the page.  He also fails to provide evidence that any expert would conclude that one of the numbers, which differed from the FBI range by only one one-thousandth, would exclude the Hi Point as a possible source.  Pope's letter, in fact, reflects his continued opinion that two firearm models were possible sources of the bullets.

determination that the evidence had only "speculative" exculpatory value was entirely reasonable. (9/23/05 Cir. Ct. Ord., 4, docket #55.)

In sum, Petitioner has failed to demonstrate that any ballistics evidence was either favorable to the defense or suppressed by the government. Further, even assuming that the evidence had some marginal evidentiary value to Petitioner's case, it was not materially prejudicial under *Brady*. *See Strickler*, 527 U.S. at 281 (materiality under *Brady* requires a defendant to demonstrate that there exists a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different). For all these reasons, Petitioner fails to demonstrate a *Brady* violation with respect to the ballistics evidence.

### B.      Preservation of the Vehicle

In his second *Brady* claim, Petitioner asserts that the prosecution violated his right to due process by failing to preserve the Range Rover in which Shemika Rogers was killed. Petitioner contends that the vehicle potentially contained forensic evidence such as fingerprints or gunpowder residue that could have supported his theory that the gunshots were fired by someone standing immediately next to the vehicle. He also argues that he should have been permitted to use the vehicle to determine the angle of the bullets.

In *Youngblood*, 488 U.S. at 57, the Supreme Court held that, in the case of a failure to preserve forensic evidence, a defendant demonstrates a due process violation only if he shows that the government acted in bad faith, even if the unpreserved evidence was potentially useful to the defendant. *See id.* Mere negligence by the government is insufficient to support a *Brady* violation in such circumstances. *Id.*

- 46 -

> Part of the reason for the difference in treatment is found in the observation made by the Court in [*California v.*] *Trombetta*, 467 U.S. 479, 486 (1984)] that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause, *see Lisenba v. California*, 314 U.S. 219, 236, 62 S. Ct. 280, 289, 86 L. Ed. 166 (1941), as imposing on the police an un-differentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.

*Id.* at 57-58.

The government's failure to preserve the Range Rover falls squarely within the ambit of *Youngblood*.  In order to demonstrate a due process violation, Petitioner is required to show that the government acted in bad faith.  *Id.* at 57-58.  As the Michigan Court of Appeals recognized, Petitioner has raised highly speculative claims regarding what further testing of the vehicle might have shown.  (MCOA Op. at 6, docket #53.)  Petitioner also has provided no evidence that the government had reason to believe the vehicle contained exculpatory evidence or that the government acted in bad faith when it disposed of the vehicle.

Moreover, Petitioner fails to demonstrate that the destruction of the Range Rover was materially prejudicial to his defense.  As multiple witnesses testified, in order to treat Shemika Rogers, the vehicle was moved before officers began their investigation.  Because the vehicle had been moved, examination of the vehicle would not have enabled Petitioner to determine its exact position at the time of the shooting.  In addition, as the Michigan Court of Appeals recognized, Petitioner had detailed photographs and other evidence concerning the vehicle, its contents, the angle at which the bullets entered the vehicle, and the location of all cartridge cases found at the scene.  Further, as Petitioner's own attorney established during cross-examination of Pope, nothing suggested the existence of any powder residue on the vehicle.  (Tr. IV, 602.)  Moreover, given the

- 47 -

rain falling on the night of the shooting, the expert testified that gunpowder residue was unlikely to be preserved. (Tr. IV, 596.) As a result, examination of the Range Rover was unlikely to produce any evidence consistent with Petitioner's theory.

Finally, the evidence against Petitioner was overwhelming. Multiple witnesses testified to having seen Petitioner shoot and carry a long gun. Others testified that they heard him make incriminating statements. Vague arguments that examination of the vehicle could have uncovered evidence that would support Petitioner's theory of a second shooter would not have undermined the identification and cartridge evidence demonstrating that a person identified as Petitioner was firing at the vehicle from some distance. The number of bullets that entered the vehicle was consistent with the number of cartridge cases found in the grassy area some distance from the vehicle. Further, Petitioner was fully able to cross-examine those witnesses about their reasons to lie and about discrepancies in their stories. An examination of the vehicle would have added little. For all these reasons, the failure to preserve the vehicle was not materially prejudicial under *Brady*. *See Strickler*, 527 U.S. at 281.

II.     Admission of Hearsay Evidence

In his second ground for habeas relief, Petitioner claims that the state court abused its discretion and rendered an unreasonable application of *Tome v. United States*, 513 U.S. 150 (1995), when it admitted Penny Ousley's testimony that Amber Speed had made a prior consistent statement to Ousley shortly after the shooting occurred.

Petitioner's reliance upon *Tome v. United States* is misplaced. *Tome* addressed the admission of a child's prior consistent statement under the Federal Rules of Evidence, not under the United States Constitution. The Federal Rules of Evidence do not apply to state criminal

proceedings.  Instead, the state criminal proceedings were governed by the Michigan Rules of Evidence, and Petitioner's claim is that those rules were wrongly applied.  *Tome* is not controlling with respect to the Michigan Rules of Evidence.

Moreover, to the extent that Petitioner challenges the application of the Michigan Rules of Evidence, his claim is not cognizable on habeas review.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Petitioner fails to demonstrate that the admission of Ousley's testimony was fundamentally unfair.  Prior consistent statements long have been admissible to rebut charges of recent fabrication. *See Tome*, 513 U.S. at 156 (noting that the "prevailing common-law rule for more than a century before adoption of the Federal Rules of Evidence was that a prior consistent statement introduced to rebut a charge of recent fabrication or improper influence or motive was admissible

- 49 -

if the statement had been made before the alleged fabrication, influence, or motive came into being . . . .”).  The testimony clearly was properly admitted under the long established common-law rule, which appears consistent with the Michigan Rules of Evidence.  Testimony about Speed's statement to her mother on the night of the shooting and the day after the shooting was introduced “to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.”  MICH. R. EVID. 801(d)(1)(B).  Petitioner unquestionably challenged Speed on cross-examination about her delay in reporting the incident and about her motive to fabricate to protect her boyfriend. (Tr. X, 1681-85, 1692-94; Tr. XI, 1830-31, 1849-50.)  And Petitioner expressly suggested and later argued that Speed's motive to lie arose when Gentry was arrested in December 2000.  (Tr. X, 1693; Tr. XVI, 2364.)  As a result, the prior consistent statement made in December 1999 was made before the alleged motive to fabricate arose.

Moreover, even if the statement were improperly admitted, in light of the extensive evidence against Petitioner, any error was harmless.  On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness.  *See Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (citing *Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321, 2328 (2007)); s*ee also Vasquez v Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007); *Montgomery v. Greer*, 956 F.2d 677, 681 & n.4 (7th Cir. 1992) (applying harmless error review to *Youngblood* claim).  The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a “substantial and injurious effect” on the result.  *Brecht*, 507 U.S. at 638.  In determining whether an error was harmless, a court must consider a number of factors, “‘includ[ing] the importance of the witness' testimony in the prosecution's case, whether the

testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave*, 248 F. App'x at 728 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).  Here, Petitioner had the opportunity to cross-examine both Speed and her mother, and he used that opportunity to highlight Speed's motive to fabricate.  Petitioner fails to demonstrate that admission of the evidence had a "substantial and injurious effect" on the result.  *Brecht*, 507 U.S. at 638.

III.   Ineffective Assistance of Appellate Counsel

Petitioner next argues that his attorney on direct appeal rendered ineffective assistance of counsel.  In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that

counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 289.

Petitioner raises two types of arguments about appellate counsel's allegedly deficient performance. First, he argues that appellate counsel rendered ineffective assistance by failing to submit adequate briefing under MICH. CT. R. 7.212(C)(7), which resulted in the appellate court finding certain claims to be abandoned. Second, he argues that appellate counsel was ineffective because his presentation of the issues was insufficiently persuasive to the appellate court.

### A.    Abandonment of issues

The only issue the appellate court deemed Petitioner to have abandoned was his claim

that the prosecutor had committed misconduct and deprived him of due process by engaging in

witness tampering.  The court of appeals held as follows:

> Defendant also argues that the prosecutor committed misconduct by allowing
> Detective Vincent to take two witnesses to the crime scene without turning over
> reports of this visit to the defense.  Trial counsel's only objection regarding this issue
> at trial was that the defense was not furnished with reports of this activity under a
> previous discovery request.  However, defendant did not assert below, nor does he
> assert on appeal, that a report concerning this matter was ever generated.  On appeal,
> defendant does not explain why this conduct should be considered improper, nor
> does he provide supporting authority for his position, or discuss whether the
> prosecutor had knowledge of Vincent's conduct.  Because defendant has failed to
> adequately present and discuss his argument, or cite supporting authority, we
> consider this issue abandoned.  MCR 7.212(C)(7); *People v Kevorkian*, 248 Mich
> App 373, 389; 639 NW2d 291 (2001); *People v Jones (On Rehearing)*, 201 Mich
> App 449, 456-457; 506 NW2d 542 (1993).

> Defendant also asserts that the prosecutor improperly sent two eyewitnesses
> to a psychologist.  Because this matter was not raised in the trial court, our review is
> limited to plain error affecting defendant's substantial rights.  *People v Carines*, 460
> Mich 750, 763; 597 NW2d 130 (1999); *People v Schutte*, 240 Mich App 713, 720;
> 613 NW2d 370 (2000).  The record fails to disclose that the prosecutor was involved
> in the decision to send the witnesses to the psychologist.  Further, defendant's claim
> that the witnesses were "hypnotized" into changing their trial testimony is not
> supported by the record.  Because defendant has failed to demonstrate plain error,
> this unpreserved issue is forfeited.

(10/14/03 MCOA Op. at 5-6, docket #53.)

With respect to the claim that two witnesses were improperly taken to the crime

scene, the court of appeals unquestionably concluded that the claim had been abandoned on appeal.

Petitioner, however, fails to demonstrate that abandonment of the issue resulted in any prejudice.

*See Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) ("When deciding ineffective-

assistance claims, courts need not address both components of the inquiry 'if the defendant makes

an insufficient showing on one.'") (quoting *Strickland*, 466 U.S. at 697). The state court considered the issue for plain error and found that Petitioner had failed to preserve the claim in the trial court beyond objecting to not having been furnished with a report under an outstanding discovery request. As the court of appeals expressly noted, Petitioner has never contended – either in the state court or in his habeas petition – that a report existed of the detective's action. Where no report was created, no discovery violation could have occurred. As a result, Petitioner fails to demonstrate any possible prejudice to Petitioner caused by appellate counsel's abandonment of the claim. *See Strickland*, 466 U.S. at 691.

With respect to Petitioner's appellate claim that the prosecutor improperly had two eyewitnesses hypnotized by a psychologist, the court of appeals made a factual finding that Petitioner's theory of witness hypnosis was not supported by the record. Where a state court has made a factual determination, that determination is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. The courts have made clear that the presumption of correctness is accorded to findings of state appellate courts, as well as those of the trial court. *See Sumner*, 449 U.S. at 546. Petitioner has failed to meet his burden of rebutting the state court's finding. Instead, he simply reargues that different inferences could be drawn from the preliminary examination testimony considered by the court of appeals. The mere possibility that a court might have drawn a different conclusion falls far short of the clear and convincing evidence required on habeas review. *See* 28 U.S.C. § 2254(e)(1).

### B.    Poor advocacy of preserved claims

In the second prong of his claim of ineffective assistance of appellate counsel, Plaintiff argues that counsel ineffectively advocated the claims of ineffective assistance of trial counsel.  Petitioner's argument is meritless.

"The fact that [a] strategy ultimately was not successful is not the standard by which an ineffective assistance of counsel claim is evaluated." *Nichols v. United States*, Nos. 1:04-cr-68, 1:06-cv-183, 2009 WL 921137, at *8 (E.D. Tenn. Apr. 1, 2009).  Instead, the Court exercises a strong presumption that counsel's performance was within the range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

Petitioner complains that appellate counsel should have investigated and attempted to introduce evidence that Amber Speed must have had a vision problem because she had had corrective surgery as a child on the muscles controlling her eyes in order to alleviate her amblyopia. New evidence, however, may not be introduced on appeal.  *See* MICH. CT. R. 7.210(A) (limiting the record on appeal to the original record from which the appeal lies).  As a consequence, the only avenue to expand the record is by a motion to remand for an evidentiary hearing in the trial court. Counsel filed a motion to remand on September 30, 2002, and it was denied on January 10, 2003. It is apparent, therefore, that appellate counsel's performance was entirely reasonable and professional.

Moreover, notwithstanding the general medical summaries about amblyopia that Petitioner has submitted, Petitioner has failed to show that Speed had any vision problems.  Both Speed and her mother testified that her childhood surgery was performed for the purpose of correcting her eye muscle control.  Both Ousley and Speed squarely denied that Speed had any vision

- 55 -

problems.  (Tr. X, 1750; Tr. XIV, 2424-25.)  Admission of collateral evidence to impeach a witness is generally barred under Michigan law.  *See* MICH. R. EVID. 608(b).  Given that further evidence about Amber Speed's amblyopia was inadmissible, trial counsel's decision not to pursue more medical information was both reasonable and nonprejudicial.  Consequently, appellate counsel's advocacy on this issue could not have affected the result of the appeal.

Petitioner also argues that his appellate attorney was ineffective in failing to pursue Petitioner's claim that, based on newly discovered ballistics evidence from Pope's October 2, 2002 letter to Petitioner, the prosecution suppressed evidence that one of the land and groove measurements Pope found could only have come from the .38 Special caliber revolver.  Counsel, however, did raise the claim of ineffective assistance of trial counsel in failing to call an expert witness to challenge the ballistics evidence given by Pope.  The appellate brief was filed by counsel before Petitioner received the letter on which he relies.  Thereafter, Petitioner was permitted to and did file a *pro se* supplemental brief in which he highlighted the "newly discovered" ballistics evidence.  As a consequence, the issue was fully presented to the court of appeals, and the court of appeals addressed the question in its opinion.  Appellate counsel's decision not to seek leave to file a supplemental brief could not have been prejudicial.

Finally, Petitioner suggests that his appellate attorney rendered ineffective assistance when the attorney did not make an offer of proof about the impact of trial counsel's failure to object to the prosecution's destruction of the Range Rover.  Specifically, Petitioner claims that appellate counsel should have relied upon and cited to the May 10, 2001 hearing on Defendant's motion to adjourn the trial.  New evidence may not be introduced on appeal.  *See* MICH. CT. R. 7.210(A). As a result, to the extent Petitioner argues that his appellate attorney should have introduced new

- 56 -

evidence about the significance of the Range Rover, appellate counsel's actions were entirely reasonable.

Moreover, to the extent Petitioner argues that his attorney should have expressly referenced pages in the May 10, 2001 transcript to bolster his appellate argument, his claim also fails. At the hearing on the motion to adjourn, defense counsel represented that he had just received a complete set of pictures showing bullet damage to the inside of the Range Rover. Counsel argued that, had the pictures been received earlier, they would have caused counsel to seek an expert who could evaluate trajectory. (Tr. Mot. to Adjourn, 13-14, docket #31) The court granted defense counsel's motion and adjourned the trial for a month to allow defense counsel the opportunity to consult an expert. (*Id.*)

On appeal, counsel focused his claim on the failure of the prosecution to produce various important items of discovery, including a claim that destruction of the Range Rover prevented Petitioner from examining the vehicle. Appellate counsel also argued that trial counsel had failed to retain an expert to challenge the crime scene and vehicle testimony. Contrary to Petitioner's assertion, appellate counsel explicitly argued that trial counsel had sought and received an adjournment to obtain an expert, yet had failed to produce expert testimony at trial.

It is difficult to see how appellate counsel could have more effectively made his point. Had appellate counsel pointed the court of appeals to the transcript from the adjournment hearing, he would have served only to highlight the fact that trial counsel had vigorously sought and received an adjournment to retain a ballistics trajectory expert. (Defs.' Mot. to Adjourn, docket #31.) Trial counsel represented on the record at that time of the adjournment hearing that he planned to use Evidence Express, a company in Detroit, to complete drawings and renditions to demonstrate the

- 57 -

location of the shooter. (Defs.' Mot. to Adjourn, docket #31 at 30.) Because trial counsel represented that he had both contacted an expert and needed time for the expert to complete his work, the hearing record strongly suggests that trial counsel's ultimate decision not to call an expert at trial was reached after hearing what the expert would say. In other words, the hearing record strongly supports the presumption that trial counsel's decision not to call an expert was strategic and that the preservation of the vehicle itself was neither necessary nor dispositive. Appellate counsel's strategy not to focus on the hearing record therefore was entirely reasonable and professional.

IV.   Prosecutorial Misconduct

In his fourth ground for habeas relief, Petitioner argues that the state court unreasonably concluded that Petitioner was not deprived of due process by prosecutorial misconduct. Misconduct by a prosecutor can rise to the level of a due process violation. *Lundy v. Campbell*, 888 F.2d 467, 474 (6th Cir. 1989). However, before habeas corpus relief becomes available, the misconduct must be so egregious as to deny the petitioner a fundamentally fair trial. *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993). The habeas court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). In addition, the court must view any misconduct in light of the strength of the competent proofs tending to establish guilt. *See Angel v. Overburg*, 682 F.2d 605, 608 (6th Cir. 1982) (*en banc*). "When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra*, 4 F.3d at 1355 (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

In his prosecutorial misconduct claim, Petitioner essentially reargues his *Brady* claim. Petitioner contends that the prosecutor engaged in intentional suppression of forensic evidence and permitted Detective Sergeant Pope to misrepresent the scientific proofs. The state court reasonably rejected Petitioner's arguments concerning the alleged suppression and misrepresentation. The basis for Pope's forensic testimony was available to Petitioner at all times. Pope was cross-examined extensively and Petitioner has failed entirely to demonstrate that Pope's trial testimony was erroneous, much less intentionally misleading. Petitioner therefore has demonstrated no prosecutorial misconduct, much less misconduct that deprived Petitioner of a fair trial. The state court's rejection of the claim constituted an entirely reasonable application of established Supreme Court precedent.

V.    Insufficient Evidence of Cause of Death

Petitioner alleges that the evidence was insufficient to prove beyond a reasonable doubt that the bullet that killed Shemika Rogers was fired by Petitioner. He renews his claims that Pope's testimony was misleading and that belatedly discovered evidence demonstrates that more than one weapon was used. He therefore argues that no jury could find beyond a reasonable doubt that the bullet that struck Rogers in the head was fired by Petitioner.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), that is, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of

- 59 -

credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Petitioner presented his fifth habeas ground in his *pro per* supplemental brief on direct appeal. The Michigan Court of Appeals analyzed the issue as follows:

> Defendant's claim that the evidence was insufficient to support a conviction for second-degree murder is without merit. To prove second-degree murder, the prosecutor was required to [] prove that defendant caused Rogers' death with malice and without justification, mitigation or excuse. [*People v*] *Bailey*, 451 Mich 657, 669; 549 NW2d 325 (1996), amended 453 Mich 1204 (1996)]. Malice can be shown by an intent to kill, an intent to inflict great bodily harm, or intent to create a very high risk of death with knowledge that the act probably would cause death or great bodily harm. *Id.*

> Defendant argues that the evidence was insufficient because the prosecutor failed to link the bullet that killed Rogers to a gun held by either himself or codefendant Jones. We disagree. "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Here, Speed testified that she saw defendant fire a rifle into Roger's car. The rifle was similar to a weapon that was consistent with the bullet slugs recovered from Rogers' body and the shell casings were found at the crime scene. This evidence, viewed in a light most favorable to the prosecution, was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that defendant fired the shot that killed Rogers. Further, defendant's conduct of shooting a gun into the occupied car was sufficient to establish the necessary element of malice. *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998); *People v. Mayhew*, 236 Mich App 112, 125; 600 NW2d 370 (1999).

(10/14/03 MCOA Op., docket #53.)

The standard applied by the Michigan Court of Appeals was fully consistent with Supreme Court precedent under *Jackson*, 443 U.S. at 319, and the court of appeals applied that

standard to each element of the offense of second-degree murder. *See id.* at 324 n.16. Moreover, ample evidence existed in the record for a reasonable jury to conclude that a bullet from a gun fired by Petitioner actually killed Rogers. As the court of appeals noted, Amber Speed provided direct evidence that Petitioner fired a gun into the vehicle from an area near the tree, and no other trial testimony even hinted that there were multiple shooters. The number of cartridge cases found in the grassy area near the tree conformed with the number of bullets recovered from the vehicle and the victim, as well as with the number of bullet holes in the vehicle. Numerous witnesses also testified that Petitioner made statements to the effect that he was the individual who had shot Rogers. Furthermore, even indulging Petitioner's speculative and unsupported assumption that two people were shooting at Shemika Rogers, Petitioner's murder conviction does not offend any constitutional guarantee. The Supreme Court has never held that when two assailants are shooting at a helpless victim from point-blank range, the Constitution requires the State to prove beyond a reasonable doubt which bullet was the cause of death. Both assailants are equally culpable. The state-court determination therefore constitutes a reasonable application of established Supreme Court precedent.

### **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied.


Dated:   May 26, 2009                          /s/  Joseph G. Scoville
                                                United States Magistrate Judge


### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections

may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).